1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        SOUTHERN DISTRICT OF CALIFORNIA
10
11   CLINICOMP INTERNATIONAL, INC.,          Case No.:  17-cv-02479-GPC (DEB)
12                                Plaintiff,
                                             **CLAIM CONSTRUCTION ORDER**
13   v.
14   CERNER CORPORATION,
15                                Defendant.
16
17        In the present action, Plaintiff CliniComp International, Inc. ("CliniComp") asserts
18   a claim of patent infringement against Defendant Cerner Corporation ("Cerner"), alleging
19   infringement of U.S. Patent No. 6,665,647 ("the '647 Patent").  (Doc. No. 1, Compl.)  On
20   February 14, 2022, the parties filed their joint claim construction hearing statement, chart,
21   and worksheet pursuant to Patent Local Rule 4.2, identifying the disputed claim terms from
22   the '647 Patent.  (Doc. No. 63.)  On March 28, 2022, the parties each filed their opening
23   claim construction briefs.  (Doc. Nos. 70, 71.)  On April 11, 2022, the parties each filed
24   their responsive claim construction briefs.  (Doc. Nos. 72, 73.)  On May 20, 2022, the
25   parties filed an amended joint claim construction chart and worksheet.  (Doc. No. 79.)
26
27
28

The Court held a claim construction hearing on July 22, 2022.[1]  Amardeep Thakur, Bruce Zisser, and Shawn McDonald appeared for Plaintiff CliniComp.  Jared Bobrow and Benjamin Austin appeared for Defendant Cerner.  After considering the parties' briefing and the arguments present at the hearing, the Court issues the following claim construction order.

## I.      BACKGROUND

CliniComp is the owner of the '647 Patent by assignment.  (Doc. No. 1, Compl. ¶ 2.)  In the present action, CliniComp alleges that Cerner directly infringes one or more claims of the '647 Patent, including but not limited to independent claim 1, by making, using, selling, and/or offering to sell within the United States Cerner's hosting and monitoring services, including at least its Remote Hosting Option ("RHO"), its Enterprise Solution Hosting ("eHosting"), and its Enterprise Cloud Services.  (Doc. No. 1, Compl. ¶¶ 15-16.)

The '647 Patent is entitled "Enterprise Healthcare Management System and Method of Using Same."  U.S. Patent No. 6,665,647, at (54) (filed Dec. 16, 2003).  The Federal Circuit described the '647 Patent as follows:

> The '647 patent describes a healthcare management system for healthcare enterprises.  The purpose of the '647 patent is to allow healthcare enterprises to consolidate legacy software applications and new software applications together on one software platform.  Many healthcare enterprises utilize legacy systems for managing data related to a variety of uses, including patient care, accounting, insurance, and administrative functions.  These established systems are often outdated and too inflexible to support healthcare enterprises in the "modern managed care environment."  '647 patent at col. 1 ll. 58–62.  The healthcare management system described in the '647 patent allows healthcare enterprises to preserve existing legacy applications while simultaneously phasing in new or updated applications on the same system.
>
> The enterprise healthcare management system in the '647 patent allows enterprises to "remotely host[] . . . turnkey health care applications" and

---

[1]     Prior to the July 22, 2022 claim construction hearing, the Court provided the parties with a tentative claim construction order.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"provide[s] . . . enterprise users access to the turnkey applications via a public network." Id. at col. 2 ll. 61–65. Enterprises can upgrade existing capabilities and add functionality not available in their current system without significant capital investments. Because the applications are hosted on a public network (i.e., the internet), the healthcare enterprise only needs computing resources sufficient to allow secure, quality access to the internet. The "turnkey" management system adjusts to changes within the enterprise as the system "easily and cost-effectively scales" to respond to an enterprise's needs. Id. at col. 3 ll. 19–23.

The information collected by the enterprise from its applications may be stored in a searchable database. Specifically, the '647 patent discloses a clinical data repository that stores information from applications within the suite of applications on the system. The clinical data repository stores "multidisciplinary information on a wide variety of enterprise functions." Id. at col. 6 ll. 31–40. For example, the clinical data repository stores pharmaceutical, radiology, laboratory, and clinical information data utilized by other applications of the application suite.

The '647 patent discloses that "the clinical data repository is a database that is partitioned" and that "the database portion may be configured as either a logical partition or a physical partition." Id. at col. 9 ll. 60–64. The healthcare management system is also capable of supporting multiple enterprises, in which case "the information related to each of the separate healthcare enterprises is stored in a separate partition of the database." Id. at col. 10 ll. 6–10. As such, when multiple enterprises are involved with using the system, the clinical data repository may have multiple partitions, with each partition holding healthcare management information for the respective enterprise.

Among other things, the '647 patent describes the partitioning of data for multiple enterprises so as to allow the storing of "[the] first healthcare data in a first portion of the database associated with the first healthcare enterprise facility" and separately storing "[the] second healthcare data in a second portion of the database associated with the second healthcare enterprise facility." Id. at col. 14 ll. 24–29. The system allows two (or more) independent healthcare enterprises to share access to certain applications while maintaining sole access to their respective unique healthcare applications. The databases are effectively "partitioned" or "portioned" in this way.

Cerner Corp. v. Clinicomp Int'l, Inc., 852 F. App'x 532, 532–33 (Fed. Cir. 2021).

///

Independent claim 1 of the '647 Patent, the only independent claim asserted by CliniComp in this action,[2] recites:

> 1.  A method of operating an enterprise healthcare management system for a first healthcare enterprise facility and a second healthcare enterprise facility independent of the first healthcare enterprise facility, comprising:
>
> establishing a first secure communication channel via a public network between an application server and a first end user device in the first enterprise facility and establishing a second secure communication channel via the public network between the application server and a second end user device in the second enterprise facility, the application server remotely hosting a healthcare application and having a database;
>
> receiving first healthcare data from the first end user and second healthcare data from the second end user;
>
> processing the first healthcare data and the second healthcare data with the healthcare application;
>
> storing the processed first healthcare data in a first portion of the database associated with the first healthcare enterprise facility and storing the processed second healthcare data in a second portion of the database associated with the second healthcare enterprise facility;
>
> configuring the database to accept legacy information derived from a legacy application operating at each of the first and second healthcare enterprise facilities, wherein the functions in the healthcare application are not duplicative of the legacy application; and
>
> generating a query to extract information from the database relevant to a respective one of the first and second healthcare enterprise facilities derived from the healthcare data and the legacy information for managing and tracking a performance of the respective one of the first and second healthcare enterprise facilities,
>
> wherein healthcare data in the first portion of the database is only accessible to the first end user device and healthcare data in the second portion of the database is only accessible to the second end user device.

'647 Patent at col. 14 ll. 8-45.

On December 11, 2017, CliniComp filed a complaint for patent infringement against

---

[2]   (See Doc. No. 71-2, Ex. C at C-3.)

Defendant Cerner, alleging infringement of the '647 Patent.  (Doc. No. 1, Compl.)  On May 16, 2018, the Court granted Cerner's motion to dismiss Clinicomp's claims for willful infringement and indirect infringement as well as the relief sought in connection with these claims of injunctive relief, treble damages, and exceptionality damages.  (Doc. No. 18 at 21.)  On June 25, 2018, Cerner filed an answer to CliniComp's complaint.  (Doc. No. 19.)

On March 5, 2019, the Patent Trial and Appeal Board ("PTAB") instituted an *inter partes* review ("IPR") as to claims 1-25 and 50-55 of the '647 Patent.  (Doc. No. 30-1, Ex. A.)  On March 7, 2019, the Court granted a stay of the action pending completion of the IPR proceedings.  (Doc. No. 31.)  On March 26, 2020, the PTAB issued a final written decision, determining that claims 50-55 of the '647 Patent are not patentable in light of the prior art, but that claims 1-25 of the '647 Patent are patentable.[3]  (Doc. No. 32, Ex. A at 93-94.)  On April 20, 2021, the Federal Circuit affirmed the PTAB's determination that claims 1-25 of the '647 Patent are patentable.[4]  (Doc. No. 38-2, Ex. B at 10.)  On June 24, 2021, the Court granted the parties' joint motion to lift the stay of the action.  (Doc. No. 44.)

On July 23, 2021, Cerner filed an amended answer to CliniComp's complaint.  (Doc. No. 52.)  On October 7, 2021, the Court issued a scheduling order in the action.  (Doc. No. 55.)  By the present claim constructions briefs, charts, and worksheets, the parties request that the Court construe six disputed claim terms from the '647 Patent.  (Doc. Nos. 70, 71, 72, 73, 79.)

---

[3]   Specifically, the PTAB concluded that Cerner had shown by a preponderance of the evidence that: (1) claims 50-52 are not patentable based on Evans; (2) claims 53 and 54 are not patentable based on Evans and Rai; (3) claims 50-53, and 55 are not patentable based on Johnson and Evans; and (4) claim 54 is not patentable based on Johnson, Evans, and Rai.  (Doc. No. 32, Ex. A at 93-94.)  The PTAB further concluded that Cerner had not shown by a preponderance of the evidence: (1) that claims 1-5, 10-13, and 15-25 are unpatentable based on Johnson and Evans; or (2) that claims 6-9, and 14 are unpatentable based on Johnson, Evans, and Rai.  (Id. at 93.)

[4]   On November 15, 2021, the PTO issued an *inter partes* review certificate for the '647 Patent, stating: "Claims 1-25 are found patentable" and "Claims 50-55 are cancelled."  (Doc. No. 71-2, Ex. A at A-20-21.)

## II.    DISCUSSION

### A.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 838 (2015); Markman v. Westview Instr., Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 135 S. Ct. at 838.

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008).  "It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Id. at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including intrinsic and extrinsic evidence.  See Phillips, 415 F.3d at 1314.  A court should begin with the intrinsic record, which consists of the language of the claims, the patent specification, and, if in evidence, the prosecution history of the asserted patent.  Id.; see also Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Vitronics, 90 F.3d at 1582; see also Comark Commc'ns v.

Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself."). The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term. See Phillips, 415 F.3d at 1314. In addition, the context in which the disputed term is used in other claims, both asserted and unasserted, may provide guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. Furthermore, a disputed term should be construed "consistently with its appearance in other places in the same claim or in other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001); accord Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008); see also Paragon Sols., LLC v. Timex Corp., 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning." (internal quotation marks omitted)). Moreover, "'[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.'" Vederi, 744 F.3d 1383.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, 744 F.3d at 1382. For example, "a claim construction that excludes [a] preferred embodiment [described in the specification] 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1290 (Fed. Cir. 2010).

But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc). Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the

only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); see also Kara Tech. Inc. v. Stamps.com Inc., 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence. Phillips, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." Id. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. See Vitronics, 90 F.3d at 1583; Teva, 135 S. Ct. at 841. However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. Phillips, 415 F.3d at 1319. "Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015); see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file

8

history."); <u>Vederi</u>, 744 F.3d at 1382 ("[E]xtrinsic evidence may be less reliable than the intrinsic evidence.").  In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." <u>Teva</u>, 135 S. Ct. at 841.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." <u>O2 Micro</u>, 521 F.3d at 1362.  In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies.  <u>See id.</u>; <u>Phillips</u>, 415 F.3d at 1314.  But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." <u>O2 Micro</u>, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. <u>Id.</u> at 1362; <u>accord</u> <u>Eon Corp. IP Holdings v. Silver Spring Networks</u>, 815 F.3d 1314, 1318 (Fed. Cir. 2016).

**B.    Disputed Claim Terms**[5]

///

---

[5]    As an initial matter, the Court notes that the '647 Patent was involved in another district court action, <u>CliniComp International, Inc. v. athenahealth, Inc.</u>, 1:18-cv-00425-LY (W.D. Tex. 2018).  At times in its claim construction briefing, CliniComp attempts to rely on rulings from the <u>CliniComp. v. athenahealth</u> case to support its claim construction positions in this case.  (<u>See, e.g.</u>, Doc. No. 70 at 1, 11 n.9, 17, 23 n.15; Doc. No. 72 at 9.)  The Court does not find CliniComp's reliance on <u>CliniComp. v. athenahealth</u> persuasive. Cerner, the defendant in this action, was not a party to that action.  In the <u>CliniComp. v. athenahealth</u> case, the parties entered into a stipulation that all of the disputed claim terms would be given their plain and ordinary meaning. (Doc. No. 70-2, Ex. A.) There is no similar stipulation in this case.  And no formal separate claim construction order was ever entered in the <u>CliniComp. v. athenahealth</u> case.

In addition, "a fresh look at a claim construction can hone a prior court's understanding and construction of a patent." <u>Rambus Inc. v. Hynix Semiconductor Inc.</u>, 569 F. Supp. 2d 946, 966 (N.D. Cal. 2008).  "[A]dditional litigation can refine and sharpen the courts' understanding of an invention and . . . a second court should not defer to a prior court's claim construction without questioning its accuracy." <u>Id.</u>; <u>see also</u> <u>Kinetic Concepts, Inc. v. Wake Forest Univ. Health Scis.</u>, No. SA-11-CV-163-XR, 2013 WL 6164592, at *3 (W.D. Tex. Nov. 25, 2013) ("Stare decisis does not preclude this court from an independent analysis of claims that have been construed in other district courts.").

1.      "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility"

Plaintiff CliniComp argues that the term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility" should be given its plain and ordinary meaning, with the caveat that the claimed "portion" is not created by merely identifying data or associating subsets of data with common values (i.e., indexing by an identifier), and these portions are created to protect one healthcare enterprise facility's data from access by the other healthcare enterprise facility. (Doc. No. 79-1 at A2.) Defendant Cerner proposes that this term be construed as "a specific data structure in the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility, wherein the claimed [first/second] 'portion' is not created by merely identifying data or associating subsets of data with common values (i.e., indexing by an identifier), and the [first/second] portion is created in the database before the claimed 'storing' of 'data' occurs, is a separately-managed and distinct compartment created for the purpose of separating data, and restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare enterprise facility." (Doc. No. 79-1 at A2-A3.)

Here, the parties dispute with respect to this claim term is multi-part. As an initial matter, the parties appear to agree that the claimed "portion" is not created by merely identifying data or associating subsets of data with common values (i.e., indexing by an identifier), and these portions are created to protect one healthcare enterprise facility's data from access by the other healthcare enterprise facility. (See Doc. No. 79-1 at A2-A3; Doc. No. 73 at 2.) Nevertheless, the parties dispute whether the claimed "portion" is a specific data structure in the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility. Additionally, the parties dispute whether the claimed "portion" is created in the database before the claimed "storing" of "data" occurs, and whether the claimed "portion" is a separately-managed and distinct compartment created for the purpose of separating

data.  The Court evaluates each of these disputes in turn below.

The Court begins with the first portion of Cerner's proposed construction: that the claimed "portion" is a specific data structure in the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility.  To support this specific construction, Cerner does not rely on the claim language or the specification of the '647 Patent.  (See Doc. No. 71 at 5-12; Doc. No. 73 at 1-2.)  Instead, Cerner relies on statements made by CliniComp during the IPR proceedings for the '647 Patent.  (See id.)  Cerner contends that these statements constitute prosecution disclaimers by CliniComp.  (See id.)

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting Omega Eng'g, Inc, v. Raytek Corp., 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" Id. at 1360 (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

"Such disclaimer can occur through amendment or argument." Aylus, 856 F.3d at 1359.  But "[f]or a statement during prosecution to qualify as a disavowal of claim scope, it must be 'so clear as to show reasonable clarity and deliberateness,' and 'so unmistakable as to be unambiguous evidence of disclaimer.'" Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1374 (Fed. Cir. 2022); see also Aylus, 856 F.3d at 1361 ("[T]o invoke the doctrine of prosecution disclaimer, any such statements must 'be both clear and unmistakable.'"); Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an ambiguous disavowal.").  "Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1095 (Fed. Cir. 2013).  "A patentee could do so, for example, by

clearly characterizing the invention in a way to try to overcome rejections based on prior art." Computer Docking Station, 519 F.3d at 1374.

"[S]tatements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer." Aylus, 856 F.3d at 1361. "'The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art.'" Genuine Enabling Tech., 29 F.4th at 1374.

To support its prosecution disclaimer argument, Cerner relies on several statements made by CliniComp during the IPR proceedings. During oral arguments before the PTAB, CliniComp argued with respect to claim 1 of the '647 Patent: "I think we explained that the patent language requires first portion to be created through partitioning. It's throughout the figures. Throughout the specification." (Doc. No. 71-2, Ex. E at E-21; see also id. at E-9 ("partitioning is what's required by the patent").) CliniComp explained: "The purpose of portioning is to partition." (Id. at E-7.) CliniComp further explained with respect to the claim term "portion:"

> So Step 1 is, you go into the database, you partition it so it is associated with an enterprise. And that's what the claim term says "associated".
>
> Once that partition is done, and it's associated with that particular enterprise, only then do you . . . store that data in the portion of the database.
>
> So this partition is an essential element of how it's done to create these portions, and these portions do not have – are not overlapping. And that's why it's done for security purposes.

(Id.; see also id. at E-18 ("The claim is designed for you to have separate health care enterprise data that is created upon a specific partition for a database that they store together."); Ex. K at K8-9.) CliniComp made these arguments to the PTAB in an effort to distinguish claim 1 of the '647 Patent from the Johnson prior art reference. (See Doc. No. 71-2, Ex. E at E-7-23.)

The Court agrees with Cerner that the above statements constitute a clear and unmistakable disclaimer by CliniComp that the claimed "portion[s]" are created through

partitioning.[6]  See MBO Lab'ys, Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1330 (Fed. Cir. 2007) ("Prosecution arguments like this one which draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not."); Uship Intell. Properties, LLC v. United States, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("[A]n applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer."); see also X2Y Attenuators, LLC v. Int'l Trade Comm'n, 757 F.3d 1358, 1362 (Fed. Cir. 2014) ("[L]abeling an embodiment or an element as 'essential' may rise to the level of disavowal.").  Thus, a claim construction reflecting CliniComp's disclaimer as proposed by Cerner is appropriate here.[7]

Cerner further argues that because the word "partition" is a technical term, the Court

---

[6]      Indeed, in its opening claim construction brief, CliniComp explains that a "material benefit of the invention is the partitioning of data in a secure manner to ensure compliance with relevant privacy statutes such as HIPAA."  (Doc. No. 70 at 3.)

[7]      In addition, the Court notes that a construction reflecting CliniComp's disclaimer that the claimed "portion" is created through partitioning is also consistent with the specification of the '647 patent.  The specification of the '647 patent uses the terms "partition" and "portion" interchangeably.  See, e.g., '647 Patent at col. 9 ll. 60–64 ("The clinical data repository is a database that is partitioned to provide a database partition for an individual enterprise as shown in block 211.  The database portion may be configured as either a logical partition or a physical partition, although a logical partition is preferred.").  (See also Doc. No. 71-2, Ex. K at K8-9.)

Indeed, the Federal Circuit noted this in its decision in the IPR proceedings.  The Federal Circuit explained:

> If the words of the '647 patent are taken in their plain meaning, the '647 patent makes clear that portions of the database are understood as either: (1) logical partitions; or (2) physical partitions.  The specification describing the database portion supports the Board's understanding that "portions" of the database described in the '647 patent take form as "partitions" and the terms (i.e., "partition" and "portion") are interchangeable in the context of the '647 patent.  '647 patent at col. 9 ll. 60–64.  The Board did not err in determining that a portion is a logical or physical separation of data.

Cerner, 852 F. App'x at 535; see also id. at 533 ("The databases are effectively 'partitioned' or 'portioned' in this way.").  As such, a construction reflecting CliniComp's disclaimer that the claimed "portion" is a partition is also consistent with the Federal Circuit's understanding of the '647 patent.

should adopt the PTAB's explanation of that term to aid the jury's understanding of the word "partition." (Doc. No. 71 at 9.)  In its decision during the IPR proceedings, the PTAB explained: "a person of ordinary skill in the art would understand 'partitions,' or the portions of data referenced in the claims, are a specific arrangement of data structures." (Doc. No. 71-2, Ex. D at D85-86.)   The Court agrees with Cerner that the PTAB's explanation of the term "partition" would be helpful to the jury.[8]  As such, the Court will include the PTAB's explanation of the term "partition" in the Court's construction for this claim term.

CliniComp submits that if the Court incorporates the PTAB's explanation into the construction for this claim term, then the Court should modify Cerner's proposed construction.  CliniComp notes that Cerner's proposed construction refers to the claimed partition as being a specific data structure, but the precise language used by the PTAB described partitions as being "a specific arrangement of data structures."  The Court agrees with CliniComp.  The PTAB's order states that "'partitions' . . . are a specific arrangement of data structures."  (Doc. No. 71-2, Ex. D at D86; see also id. Ex. K at K6-9.)  Therefore, the Court will modify Cerner's proposed construction to include the phrase "a specific arrangement of data structures."

CliniComp concedes that it made certain disclaimers during the IPR proceedings, but argues that the disclaimers it made were not as broad as Cerner contends.  (Doc. No. 70 at 7; Doc. No. 72 at 2-4 (citing Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1177 (Fed. Cir. 2008) ("[E]ven in the case of an unequivocal disavowal of claim scope, the court must construe the claim 'congruent with the scope of the surrender.'")).)  CliniComp argues that the only claim scope it disclaimed during the IPR proceedings was that

---

[8]     CliniComp argues that this clarification is unnecessary because the claims use the word "portion" and not "partition."  (Doc. No. 72 at 2.)  The Court rejects this argument.  Even though the claims use the word "portion," CliniComp made multiple clear and unmistakeable disavowals to the PTAB explaining that the claimed "portion" is created through partitioning.  Thus, a claim construction reflecting those disclaimers is necessary, and a construction aiding the jury in the meaning of the word "partition" is preferred.

14

"indexing alone is insufficient to create the claimed database portions," as that was all that was needed to distinguish the claimed invention from the prior art before the PTAB. (Doc. No. 72 at 2; <u>see</u> Doc. No. 71-2 Ex. D at D-85-86.)   The Court rejects CliniComp's argument.  Even assuming CliniComp is correct, and a disclaimer of indexing alone as the mechanism for creating the claimed database portions was sufficient to distinguish the claimed invention from the prior art at issue, CliniComp did not focus its arguments to the PTAB solely on indexing.  Rather, CliniComp also repeatedly and clearly stated that the claimed "portion" is created through partitioning.[9]  (Doc. No. 71-2 at E-7, E-9, E-18, E-21.)  Those statements regarding partitioning might not have been necessary to distinguish the claimed invention from the prior art.  Nevertheless, they were clear and unmistakable and constitute prosecution disclaimers.  <u>See</u> <u>Tech. Props. Ltd. LLC v. Huawei Techs. Co.</u>, 849 F.3d 1349, 1358 (Fed. Cir. 2017) ("The patentee's disclaimer may not have been necessary, but its statements made to overcome Magar were clear and unmistakable."); <u>Data Engine Techs. LLC v. Google LLC</u>, 10 F.4th 1375, 1383 (Fed. Cir. 2021) ("[W]e have held patentees to distinguishing statements made during prosecution even if they said more than needed to overcome a prior art rejection.").

Turning to the next portion of Cerner's proposed construction, Cerner contends that the Court's construction of this claim term should explain that the claimed "portion" is created in the database before the claimed "storing" of "data" occurs.  To support this portion of its construction, Cerner also relies on statements made by CliniComp during the IPR proceedings.  (Doc. No. 71 at 6; Doc. No. 73 at 2-3.)  During the IPR proceedings, in an effort to distinguish claim 1 from the prior art at issue, CliniComp stated: "Once that partition is done, and it's associated with that particular enterprise, only then do you . . . store that data in that portion of the database."  (Doc. No. 70-2 at E-7.)  CliniComp further

---

[9]     Indeed, in its decision, the Federal Circuit recognized that CliniComp had made this concession. <u>See</u> <u>Cerner</u>, 852 F. App'x at 535 ("[T]he parties and the Board proceeded on the assumption that the terms "partition" as used in the specification and the term 'portion' as used in the claim were interchangeable and that they had a common ordinary meaning to one of skill in the art.").

stated in regards to claim 1: "You have to create that compartment for a particular service provider before you can put the data in, before you can do that search." (Id. at E-12.)  In addition, CliniComp distinguished the prior art reference Johnson from claim 1 on the grounds that "[t]here's no partitioning, and there's no identification – association with a particular service provider before the data is stored.  That's not what happens in Johnson." (Id. at E-10.)  The Court agrees with Cerner that these statements are sufficient to constitute a clear and unmistakable disclaimer that the claimed "portion," or partition, of the database must be created and associated with the enterprise prior to storing data in that portion of the database.  See MBO Lab'ys, 474 F.3d at 1330; Uship, 714 F.3d at 1315.  As such, the Court will adopt this part of Cerner's proposed construction for this claim term.

Turning to the next portion of Cerner's proposed construction, Cerner requests that the Court's construction of this claim term should explain that the claimed "portion" is a separately-managed and distinct compartment created for the purpose of separating data. To support this portion of its construction, Cerner relies on additional statements made by CliniComp during the IPR proceedings.  (Doc. No. 73 at 3.)  During the IPR proceedings, CliniComp argued:

> I think . . . the patent owner's expert, Dr. Bergeron, does, I think, a really nice job of explaining what partitions are, and what is expected with a partition.  I think – I have a software engineering degree, so I always think of logical databases as being separate and distinct.  That's the term I was – I grew up learning.
>
> And any – does even a better job of saying, you know, that's what it means separate and distinct and having your own management.

(Doc. No. 70-2 at E-17.)  CliniComp made these statements in an effort to distinguish claim 1 of the '647 Patent from the Johnson prior art reference.  (See id. at E-13-17.)  The Court agrees with Cerner that the above statements constitute a clear and unmistakable disclaimer regarding the meaning of the word "partition."  Nevertheless, it is unclear to the Court why this additional clarification is needed.  The first part of Cerner's proposed construction, which the Court will adopt, already includes the meaning of the word "partition" as defined by the PTAB.  Claim construction "is not an obligatory exercise in redundancy." U.S.

<u>Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  As such, the Court declines to adopt this part of Cerner's proposed construction.

CliniComp criticizes Cerner's proposed construction on the grounds that it appears to potentially require that there be three different "healthcare enterprise facilities" when the preamble of claim 1 makes clear that the claim only requires a minimum of two.  (Doc. No. 70 at 6; Doc. No. 72 at 2-3.)  To the extent Cerner's proposed construction is ambiguous as to the required number of "healthcare enterprise facilities," any such ambiguity is easily resolved by adopting the modifications proposed by Cerner in its responsive claim construction brief and its amended claim construction chart.  (<u>See</u> Doc. No. 73 at 2 n.1; Doc. No. 79-1 at A2-A3.)

Finally, CliniComp argues that if the Court adopts Cerner's proposed construction for this claim term, the Court should modify Cerner's proposal to state that the portion/partition is "of the database," not "in the database."  The Court agrees with CliniComp.  The claim language uses the phrase "of the database."  '647 Patent at col. 14 ll. 26, 28.  And during the IPR proceedings, CliniComp used the phrase "of the database" to describe the portions/partitions.  (<u>See, e.g.</u>, Doc. No. 71-2 Ex. E at E5, E11, E13, E14, E21, E22.)  As such, the Court will modify Cerner's proposed construction to include phrase "of the database."

In sum, the Court adopts a slightly modified version of Cerner's proposed construction for this claim term.  The Court construes the term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility" as "a specific arrangement of data structures of the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility, wherein the claimed [first/second] 'portion' is not created by merely identifying data or associating subsets of data with common values (i.e., indexing by an identifier), and the [first/second] portion of the database is created before the claimed 'storing' of 'data' occurs, and restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare

enterprise facility."

2.   "<u>configuring the database to accept legacy information derived from a legacy application</u>"

Plaintiff CliniComp argues that the term "configuring the database to accept legacy information derived from a legacy application" should be given its plain and ordinary meaning, and, thus, no construction is necessary for this claim term.  (Doc. No. 70 at 8; Doc. No. 79-1 at A5-A6.)  Defendant Cerner proposes that this claim term be construed as "configuring the database to accept legacy information that has not been converted to match the capabilities of the database."  (Doc. No. 71 at 12; Doc. No. 79-1 at A5-A6.)  Here, the parties dispute whether the Court's construction for this claim term should require that the database be able to accept legacy information that has not been converted to match the capabilities of the database.

The Court begins its analysis of the parties' dispute by reviewing the claim language.  Independent claim 1 of the '647 Patent recites: "configuring the database to accept legacy information derived from a legacy application."  '647 Patent at col. 14 ll. 31-32.  Here, a review of the claim language does not resolve the parties' dispute.  The claim language states that the database is configured to accept legacy information from the legacy application.  But the claim language does not expressly state whether the database must be configured to accept unconverted legacy information.  As such, the Court turns to the '647 Patent's specification.

To support its position, CliniComp cites to a passage in the specification explaining that the legacy application can "transmit raw or processed information" to the application server for storage.  (Doc. No. 70 at 9.)  <u>See</u> '647 Patent at col. 13 ll. 12-19 ("[T]he installer will enable the legacy application to transmit raw or processed information to the application server so that this information can be collected and retain[ed] for future report processing as shown in block 358.  The database on the application server is configured to accept the information as transmitted from the legacy application as shown in block 359.").  This passage actually cuts against CliniComp's claim construction position.  Here, the

18

specification states that the legacy application can transmit processed information to the server, which will then be accepted by the database.  But it also states that the legacy application can transmit raw information, which will then be accepted by the database.  Thus, to include this embodiment described in the specification within the scope of the claims, claim 1 needs to be interpreted such that the database is configured to accept raw (i.e., unprocessed) information from the legacy application.[10]   A construction to the contrary would improperly exclude a preferred embodiment from the scope of the claims.  See Kaufman v. Microsoft Corp., 34 F.4th 1360, 1372 (Fed. Cir. 2022) ("'A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'").  As such, the specification supports Cerner's proposed construction, and it does not support CliniComp's position.

In addition, the prosecution history supports Cerner's proposed construction.  During the IPR proceedings, CliniComp argued that the prior art reference Evans did not disclose or teach the "configuring a database" limitation.[11]   (Doc. No. 71-2, Ex. I at I-3-4.) CliniComp stated:

> Even if such "legacy information" was disclosed in Evans, Evans does not disclose configuring a database to accept such information. . . .  Evans does not teach "configuring *the database* to accept legacy information"

---

[10]   CliniComp appears to misunderstand Cerner's proposed construction.  CliniComp asserts that Cerner's proposed construction is improper because the specification does not require that the legacy information be unconverted.  (Doc. No. 70 at 9.)  But Cerner's proposed construction does not include this requirement.  Cerner's proposed construction does not require that the legacy information must be unconverted.  Rather, Cerner's proposed construction merely requires that the database be configured to accept unconverted legacy information if it is in that form.  Under Cerner's proposed construction, it is permissible for the database to accept processed legacy information as long as it is also capable of accepting raw (or unprocessed) legacy information.

[11]   CliniComp states that Cerner failed to specifically identify these passages from CliniComp's Preliminary Response in Cerner's claim construction disclosures as required by Patent Local Rule 4.2(b).  (Doc. No. 70 at 10; Doc. No. 72 at 5.)  Nevertheless, CliniComp does not request that the Court strike Cerner's reliance on these passages from the Preliminary Response.  (See id.)  Further, even if the Court did not consider these passages from the Preliminary Response, Cerner's proposed construction is still supported by the statements in the specification explaining that the database is able to accept raw information from the legacy application.

17-cv-02479-GPC (DEB)

(Emphasis added.).  Instead, Evans teaches that the *data* must be converted to match the capabilities of the database, not, as required by the claims, that the *database* be configured to accept the legacy data.  . . .

Thus, according to Petitioner's analysis, Data Manager 202 within Patient Data Repository 102 [from Evans], which Petitioner characterizes as the claimed database recited in the claims, is never configured to accept legacy data because it only accepts data that has already be [sic] converted into "the proper format."

(Id. (emphasis in original).)

Here, CliniComp unambiguously states that Evans does not satisfy the "configuring a database" limitation because the claimed database in Evans only accepts data that has already been converted into the proper format.  This is sufficient to constitute a clear and unmistakable disclaimer of any claim interpretation that would permit the "configuring a database" limitation to be satisfied by a database that is only able to accept data that has already been converted into the proper format.  See MBO Lab'ys, 474 F.3d at 1330 ("Prosecution arguments like this one which draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not."); Uship, 714 F.3d at 1315 ("[A]n applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer.").  As such, Cerner's proposed construction is also supported by the disclaimer in the prosecution history.

Nevertheless, the Court agrees with CliniComp's contention that a construction for this claim term explaining that the database is configured so that it can accept both raw or processed information is preferable over Cerner's proposed construction.  A construction for this claim term containing the words "raw" and "processed information" utilizes the precise language contained in the specification describing the "configuring" step.  '647 Patent at col. 13 ll. 14.  As such, the Court construes the term "configuring the database to accept legacy information derived from a legacy application" as "configuring the database to accept both raw and processed legacy information."

///

3.  "wherein the functions in the healthcare application are not duplicative of the legacy application"

Plaintiff CliniComp argues that the term "wherein the functions in the healthcare application are not duplicative of the legacy application" should be given its plain and ordinary meaning, and, thus, no construction is necessary for this claim term.  (Doc. No. 70 at 11; Doc. No. 79-1 at A9-A10.)  Defendant Cerner proposes that this term be construed as "wherein the healthcare application does not perform any of the same functions that the legacy application performs."  (Doc. No. 71 at 15; Doc. No. 79-1 at A9-A10.)

Here, the parties dispute whether the term "not duplicative" requires that the healthcare application not perform any of the same function as the legacy application.  CliniComp argues that there can be some duplicative functions.  (Doc. No. 70 at 11-12.)  Cerner argues that there can be no duplicative functions.  (Doc. No. 71 at 15.)

The Court begins its analysis of the parties' dispute by reviewing the claim language.  Independent claim 1 of the '647 Patent recites: "configuring the database to accept legacy information derived from a legacy application . . . , wherein the functions in the healthcare application are not duplicative of the legacy application."  '647 Patent at col. 14 ll. 31-35.  The Court agrees with CliniComp that, here, the claim language explains that "the functions performed by the healthcare application must not duplicate the functions performed by the legacy application."  (Doc. No. 70 at 11.)  The common meaning of the word "duplicate" is "being the same as another" or "identical."  MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/duplicative.  Thus, by stating that the "functions" (plural) in the two applications must not be identical to each other, the claim language merely requires that there not be a total overlap of functions between the applications.  The claim language does not forbid any overlap in functions as Cerner contends.  As such, the claim language supports CliniComp's position, and it does not support Cerner's contention.

To support its proposed construction, Cerner relies solely on the prosecution history of the '647 Patent, specifically statements made during the IPR proceedings.  (Doc. No. 71

at 15-16.)  Cerner contends that during the IPR, CliniComp presented certain arguments to the PTAB contending that the prior art reference Evan did not satisfy the "not duplicative" claim limitation.  (Id. (citing Doc. No. 71-2, Ex. H at H-5-6).)  Cerner is incorrect, and its contention is not supported by a review of the record.  In the cited document, CliniComp's sur-reply brief, CliniComp argued that the prior art reference Evans did not satisfy the "healthcare application" claim limitation.  (See Doc. No. 71-2, Ex. H at H-5-6.)  The cited portions of the sur-reply brief make no reference to the "not duplicative" limitation.  (See id.)  Thus, Cerner's reliance on the prosecution history is misplaced, and Cerner has failed to offer any persuasive support for its proposed construction.

In sum, the Court rejects Cerner's proposed construction for this claim term.  The Court gives the claim term "wherein the functions in the healthcare application are not duplicative of the legacy application" its plain and ordinary meaning, and the Court will not construe the claim term.

4.    "generating a query to extract information from the database . . . derived from the healthcare data and the legacy information for managing and tracking a performance of the respective one of the first and second healthcare enterprise facilities"

Plaintiff CliniComp argues that the term "generating a query to extract information from the database . . . derived from the healthcare data and the legacy information for managing and tracking a performance of the respective one of the first and second healthcare enterprise facilities" should be given its plain and ordinary meaning, and, thus, no construction is necessary for this claim term.  (Doc. No. 70 at 13; Doc. No. 79-1 at A11.) Defendant Cerner proposes that this term be construed as "generating a query to extract information from the database . . . derived from both the healthcare data and the legacy information, wherein the extracted information is for managing and tracking a performance of the respective one of the first and second health care enterprise facilities and not for tracking or managing the care of individual patients."  (Doc. No. 71 at 16; Doc. No. 79-1 at A11-A12.)

22

Here, Cerner's proposed construction is three-part.  First, Cerner contends that the extracted information is information derived both from the healthcare data and the legacy information.  Second, Cerner contends that the extracted information is for managing and tracking a performance of the respective one of the first and second health care enterprise facilities.  Third, Cerner seeks to clarify that the extracted information is not for tracking or managing the care of individual patients.  The Court addresses each of these portions of Cerner's proposed construction in turn below.

With respect to the first portion of Cerner's proposed construction, Cerner contends that the extracted information must be derived both from the healthcare data and the legacy information.  (Doc. No. 71 at 16.)  CliniComp argues that Cerner misreads the claim language, and the claimed "generating" step merely requires generating the query and not executing it.  The Court agrees with CliniComp.

Independent claim 1 recites: "generating a query to extract information from the database."  '647 Patent at col. 14 ll. 36-37.  Here, the claim language encompasses "generating" a query to extract information.  It does not require executing the query and actually extracting the information.

Indeed, an analysis of the dependent claims of the '647 Patent shows that independent claim 1 does not even require the presence of legacy information in the database.  Dependent claim 20 of the '647 Patent introduces the limitation of "storing in the database information received from a legacy program."  '647 Patent at col. 15 ll. 24-26.  Thus, under the doctrine of claim differentiation, independent claim 1 does not include the limitation of storing in the database information received from the legacy application/program.  See InterDigital Commc'ns, LLC v. Int'l Trade Comm'n, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("The doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.'").  The Court acknowledges that "the doctrine of claim differentiation creates only a presumption, which can be overcome by strong contrary evidence."  See id.  But Cerner has not provided the Court with any such strong contrary

evidence.

Cerner contends that CliniComp's claim differentiation argument fails because dependent claim 20 uses the term "a legacy program" rather than using the term "the legacy application." Cerner contends that by not using the specific term "the legacy application," dependent claim 20 does not refer to the "legacy application" claimed in claim 1. The Court does not find Cerner's argument persuasive. Cerner has not adequately explained to the Court what, if any, difference there is between a "a legacy program" and "a legacy application" in terms of the '647 Patent. The Court notes that the specification of the '647 Patent uses the terms "application" and "program" interchangeably. See, e.g., '647 Patent at col. 4 ll. 43-48 ("Of course, a healthcare enterprise may already be successfully using a healthcare management application, for example, such as a financial application. If the healthcare enterprise desires to continue to use such a legacy program, the financial information from the legacy program is simply transmitted to the database and stored therein."). As such, the Court rejects Cerner's argument.

Cerner argues that the claim language requires that the "legacy information" be present in the system. To support this argument, Cerner relies on the following claim language: "generating a query to extract information . . . derived from the healthcare data and the legacy information." '647 Patent at col. 14 ll. 36-39. Cerner argues that one cannot extract information derived from legacy information unless legacy information is present in the system. But, again, Cerner misreads the claim language. The claim language merely requires "generating" the query. It does not require executing the query and extracting the information.

Cerner also argues that independent claim 1's use of the definite article "the" to describe the "legacy information" in the "generating" step also supports its contention that the legacy information must be present in the system. The Court disagrees. By using the word "the" to describe the "legacy information" in the "generating" step, claim 1 merely refers back to its earlier recitation of the term "legacy information" in the "configuring" step. See Wi-Lan, Inc. v. Apple, Inc., 811 F.3d 455, 462 (Fed. Cir. 2016) ("Subsequent

use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim."). The "configuring" step merely encompasses "configuring the database to accept legacy information." '647 Patent at col. 14 ll. 31. It does not expressly require accepting the legacy information and then storing it in the database. See id. That claim 1 does not expressly require the storing of legacy information in the database is notable because the claim language does expressly require the "storing" of the "processed [first/second] healthcare data" in the database. '647 Patent at col. 14 ll. 24-29. The "storing" step in claim 1 shows that when the patentee wanted to require that something be stored in the database, it used precise language stating so. The patentee did not use any such language with respect to the claimed "legacy information." As such, the Court rejects Cerner's argument.

Cerner also submits that the specification supports its proposed construction because the specification describes the disclosed system as using legacy information to generate multidisciplinary performance reports. (Doc. No. 71 at 16-17 (citing '647 Patent at col. 4 ll. 48-53, col. 8 ll. 42-44, col. 13 ll. 10-32, fig. 7).) But this language in the specification is insufficient to support Cerner's proposed construction. That the specification describes embodiments of the invention where the legacy information is stored in the database does not change that fact that the limitation of storing the legacy information in the database is not introduced in the claim language until dependent claim 20. As such, the Court rejects the first portion of Cerner's proposed construction for this claim term.

Turning to the second portion of Cerner's proposed construction, CliniComp contends that Cerner's proposed construction improperly shifts the focus of the claim from the generated query to the extracted data. (Doc. No. 70 at 15.) The Court agrees with CliniComp. The grammatical structure of the claim provides that it is the query that is "for managing and tracking a performance" and not the information. See '647 Patent at col. 16 ll. 36-41. As such, the Court rejects the second portion of Cerner's proposed construction.

Turning to the third portion of Cerner's proposed construction, CliniComp argues that Cerner's clarification that the claimed managing and tracking is not for tracking or

1  managing the care of individual patients is unnecessary.  (Doc. No. 70 at 16; Doc. No. 72

2  at 7.)  The Court agrees with CliniComp.  Here, the claim language clearly states that what

3  is being managed and tracked is "a performance of the respective one of the first and second

4  healthcare enterprise facilities."  '647 Patent at col. 14 ll. 39-41.  Further, CliniComp does

5  not dispute this.  CliniComp acknowledges that the claim language is "clearly directed to

6  the 'healthcare enterprise facilities' and not to individual patients."  (Doc. No. 70 at 16;

7  Doc. No. 72 at 7-8.)  As there is no ambiguity in the claim language at issue and no dispute

8  between the parties regarding the scope of this portion of the claim, Cerner's proposed

9  clarification is unnecessary.  See Eon Corp. IP Holdings v. Silver Spring Networks, 815

10 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in

11 controversy, and only to the extent necessary to resolve the controversy.'"); see also U.S.

12 Surgical, 103 F.3d at 1568 (Claim construction "is not an obligatory exercise in

13 redundancy.").   As such, the Court rejects the third portion of Cerner's proposed

14 construction.

15    In sum, the Court rejects Cerner's proposed construction for this claim term.  The

16 Court gives the term "generating a query to extract information from the database . . .

17 derived from the healthcare data and the legacy information for managing and tracking a

18 performance of the respective one of the first and second healthcare enterprise facilities"

19 its plain and ordinary meaning, and the Court will not construe the claim term.

20    5.   "wherein healthcare data in the first portion of the database is only accessible

21       to the first end user device and healthcare data in the second portion of the

22       database is only accessible to the second end user device"

23    Plaintiff CliniComp proposes that the term "wherein healthcare data in the first

24 portion of the database is only accessible to the first end user device and healthcare data in

25 the second portion of the database is only accessible to the second end user device" be

26 construed as "healthcare data in the first portion of the database is only accessible to the

27 first end users (and their devices) associated with the first healthcare enterprise facility and

28 healthcare data in the second portion of the database is only accessible to the second end

26

1  users (and their devices) associated with the second healthcare enterprise facility.  Nothing
2  in this claim precludes others not directly associated with the healthcare enterprise facility,
3  such as those tasked with maintaining or improving the system, assisting users in using the
4  system, or collecting data for reports or research, from having access to the data."  (Doc.
5  No. 70 at 16; Doc. No. 79-1 at A14.)  Defendant Cerner argues that this term should be
6  given its plain and ordinary meaning, and, thus, no construction is necessary for this claim
7  term.  (Doc. No. 71 at 18; Doc. No. 79-1 at A14.)  Cerner proposes, in the alternative, that
8  the term be construed as "wherein the portioning of the database enables restricting access
9  such that healthcare data stored in the first portion of the database cannot be accessed by
10  any device other than the first end user device and healthcare data stored in the second
11  portion of the database cannot be accessed by any device other than the second end user
12  device."  (Doc. No. 71 at 18-19; Doc. No. 79-1 at A14-A15.)

13       Here, the parties dispute whether this claim term requires that the first portion of the
14  database be accessible to only the first end user device, as Cerner contends, or whether the
15  claim term requires that the first portion of the database be accessible to only the first end
16  user and their devices, as CliniComp contends.  In addition, the parties dispute whether this
17  claim term precludes third parties not directly associated with the healthcare enterprise
18  facilities from accessing the database.

19       The Court begins its analysis of the parties' dispute by reviewing the claim language.
20  Independent claim 1 recites: "wherein healthcare data in the first portion of the database is
21  only accessible to the first end user device and healthcare data in the second portion of the
22  database is only accessible to the second end user device."  '647 Patent at col. 14 ll. 42-45.
23  Here, the claim language expressly states that the healthcare data in the first portion of the
24  database is only accessible to the first end user "device."  Thus, the claim language supports
25  Cerner's proposed construction, and it does not support CliniComp's proposal.

26       CliniComp argues that the claim language supports its proposed construction
27  because the claim language focuses on healthcare enterprise facilities and their interactions,
28  through users and their devices, with the healthcare management system.  (Doc. No. 70 at

27

18.)   The Court acknowledges that independent claim 1 is directed to "an enterprise healthcare management system for a first healthcare enterprise facility and a second healthcare enterprise facility." '647 Patent at col. 14 ll. 8-10.   Nevertheless, claim 1 further recites "a first end user device in the first enterprise facility" and "a second end user device in the second enterprise facility." Id. at col. 14 ll. 13-18.   And claim 1 further states that it is these user devices that have sole access to the respective portions of the databases. Id. at col. 14 ll. 42-45.   If the patentee wanted the access to be limited to the healthcare enterprises' users rather than its devices, then the patentee could have used express language stating so.   The patentee did not.   Thus, the claim language does not support CliniComp's proposed construction, and the Court agrees with Cerner that CliniComp's proposed construction impermissibly seeks to rewrite the claim language. See Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("Courts cannot rewrite claim language.").

CliniComp submits that the specification supports its proposed construction.   To support this contention, CliniComp cites to several passages in the specification, and argues that these passages disclose a system where access to the data is always described as user centric.   (Doc. No. 70 at 19 (citing '647 Patent at col. 4 ll. 15-24, col. 6 ll. 41-44, col. 11 ll. 44-52, col. 11 ll. 53-55).)   But CliniComp's contention is not entirely correct.   For example, in one of the cited portions of the specification, the specification describes a "care giver" obtaining access to the application server. See '647 Patent at col. 11 ll. 53-55.   The specification explains that the care giver obtains this access via a "computing device," and the information from the "device" is what authorizes the care giver to access the application server. See id. at col. 11 ll. 44-52 ("The care provider has a computing device connected to the Internet as shown in block 304.   The care provider initiates a communication tunnel to the application server and the care provider[']s computing device as shown in block 305. The application server has a database of security information stored in the EMPI.   The EMPI information is compared with information received from the caregiver's terminal device to authorize the care giver to access the application server as shown in block 306.");

see also id. at col. 13 ll. 2-5 ("The installer installs the necessary hardware and software at the healthcare enterprise to initiate communication tunnels between the server and an end-user device on the established network as shown in block 355.").  Thus, the specification is consistent with the claim language's requirement that the "user device" has sole access to the respective portion of the database.  And the specification is consistent with Cerner's proposed construction.

CliniComp contends that Cerner's proposed construction for this claim term is improper because it would exclude a preferred embodiment from the scope of the claims.  "'A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'"  Kaufman, 34 F.4th at 1372.  To support this argument, CliniComp notes that the specification describes a preferred embodiment where the system includes the ability to aggregate data across multiple database partitions to enable reporting on the performance of multiple entries.  (Doc. No. 70 at 19-21 (citing '647 Patent at fig. 2, fig 4, col. 4 ll. 32-42, col. 7 ll. 10-12, col. 8 ll. 7-13, col. 9 ll. 13-23, col. 10 ll. 6-15, col. 11 ll. 24-35).)  CliniComp further notes that dependent claims 21 and 23 specifically claim this feature of enabling aggregation of data across multiple database partitions.  (Id. at 21-22.)  CliniComp argues that Cerner's proposed construction would exclude this preferred embodiment because if only the user device can access the data, it would be impossible for a third-party entity, not affiliated with either healthcare enterprise or its associated devices, to access and aggregate the relevant data.  (Id. at 20-21.)  But there are two problems with CliniComp's arguments regarding this preferred embodiment.

First, the specification's disclosure of a preferred embodiment with the specific feature of the ability to aggregate data across multiple database partitions to enable reporting on the performance of multiple entries does not support CliniComp's broad proposed construction.  CliniComp's broad construction would permit access to the data by any third party not directly associated with the healthcare enterprise facilities.  CliniComp provides no support in the intrinsic record for such a broad grant of access.

1        Second, Cerner does not dispute that the provisions of the "wherein" clause still permit the system itself to access the data in addition to the claimed user device.  Cerner explains that the specification discloses that the database engine itself accesses the data to generate the reports described in the preferred embodiment relied on by CliniComp.  (Doc. No. 71 at 22; Doc. No. 73 at 9)  Cerner is correct.  The specification of the '647 Patent explains that the database engine can be used to extract aggregate information on enterprise performance.  <u>See</u> '647 Patent at col. 11 ll. 9-11("This database may then be queried with a database engine to extract aggregate information on enterprise performance as shown in block 251."), col. 10 ll. 10-12 ("The database engine can then be used to query across multiple database partitions as indicated in block 217."), col. 11 ll. 28-30 ("The database may then query information stored in all partitions as shown in block 271.").  With this clarification, Cerner's proposed construction does not exclude the preferred embodiment of the invention where the database itself accesses data across multiple database partitions to enable reporting on the performance of multiple entries.[12]

        Finally, CliniComp argues that Cerner's proposed construction is wrong because Cerner's construction describes an unworkable system where there is only one user device per healthcare enterprise facility.  (Doc. No. 70 at 22.)  It is not clear from the briefing that

---

[12]    In the tentative claim construction order, the Court stated that it would consider a construction for this claim term clarifying that the "wherein" clause does not prohibit the database itself from accessing the data to aggregate information and generate reports.  At the claim construction hearing, CliniComp requested that the Court adopt such a construction for this claim term.  In response, Cerner argued that such a construction was unnecessary because there was no dispute between the parties regarding whether the database can access the data, and such a construction might unnecessarily confuse the jury.

    After considering the parties' arguments, the Court agrees with Cerner.  The parties are in agreement that the "wherein" clause does not prohibit the database itself from accessing the data to aggregate information and generate reports.  As there is no dispute regarding claim scope on this specific issue, it is unnecessary for the Court to adopt a construction clarifying that the "wherein" clause does not prohibit the database itself from accessing the data to aggregate information and generate reports.  <u>See</u> <u>Eon</u>, 815 F.3d at 1318–19 ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"); <u>see also</u> <u>U.S. Surgical</u>, 103 F.3d at 1568 (Claim construction "is not an obligatory exercise in redundancy.").

17-cv-02479-GPC (DEB)

Cerner does indeed contend that can only be one user device per healthcare facility. But to the extent Cerner does contend that there can only be a single device, the claim language does not support that contention.

Claim 1 recites a method "comprising," among other things: "a first end user device in the first enterprise facility" and "a second end user device in the second enterprise facility." Id. at col. 14 ll. 11, col. 14 ll. 13-18. The Federal Circuit "'has repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising."'" That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one.'" Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342 (Fed. Cir. 2008); accord Convolve, Inc. v. Compaq Computer Corp., 812 F.3d 1313, 1321 (Fed. Cir. 2016). Further, "[l]ike the words 'a' and 'an,' the word 'the' is afforded the same presumptive meaning of 'one or more' when used with the transitional phrase 'comprising.'" Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1350–51 (Fed. Cir. 2005). Thus, by using the words "comprising," "a," and "the" to describe the claimed user device, the claim language provides that there may be "one or more" user devices per healthcare facility.

At the claim construction hearing, Cerner acknowledged that under Federal Circuit precedent, the word "a" means "one or more." Cerner proposed resolving this issue by construing the term "a [first/second] end user device" as "one or more [first/second] end user device(s)" in addition to adopting its proposed construction for the "wherein" clause. The Court accepts Cerner's proposal. See Convolve, 812 F.3d at 1321; Baldwin Graphic, 512 F.3d at 1342.

In sum, the Court adopts a slightly modified Cerner's proposed construction for this claim term, and the Court rejects CliniComp's proposed construction. The Court construes the term "wherein healthcare data in the first portion of the database is only accessible to the first end user device and healthcare data in the second portion of the database is only

accessible to the second end user device" as "wherein the portioning of the database enables restricting access such that healthcare data stored in the first portion of the database cannot be accessed by any device other than the first end user device(s) and healthcare data stored in the second portion of the database cannot be accessed by any device other than the second end user device(s)."   In addition, the Court construes the term "a first end user device" as "one or more first end user device(s)," and the Court construes the term "a second end user device" as "one or more second end user device(s)."

      6.   "operating at"

Plaintiff CliniComp proposes that the term "operating at" should be given its plain and ordinary meaning, and, thus, no construction is necessary for this claim term.  (Doc. No. 70 at 23; Doc. No. 79-1 at A8.)  Defendant Cerner responds that this term be construed as "in operation at."  (Doc. No. 71 at 23; Doc. No. 79-1 at A8.)  Here, the parties dispute whether the claimed "legacy application" must be currently operating at the enterprise healthcare facility.  (See Doc. No. 70 at 23-22; Doc. No. 71 art 23.)

The Court begins its analysis of the parties' dispute by reviewing the claim language. Independent claim 1 recites: "configuring the database to accept legacy information derived from a legacy application operating at each of the first and second healthcare enterprise facilities."  '647 Patent at col. 14 ll. 31-33.  Cerner contends that by using the present tense of the verb "operating," the claim language imposes a temporal limitation requiring that the legacy application be currently operating at the facility.  (Doc. No. 71 at 23.)  In response, CliniComp argues that Cerner's position fails to read the term "operating at" in the context of its surrounding words.  The claim language at issue explains that the legacy information is "derived from" (past tense) a legacy application operating at each of the facilities.  '647 Patent at col. 14 ll. 31-33.  CliniComp reasons, therefore, if there is any temporal limitation imposed by the claim language, it is only that the legacy application be operating at the healthcare enterprise facility at the time the legacy information was derived from the legacy application.  (Doc. No. 72 at 10.)  The Court agrees with CliniComp's analysis of the claim language, and the claim language itself is insufficient to support

Cerner's proposed construction.

Nevertheless, a disclaimer in the specification supports Cerner's proposed construction. The specification of the '647 Patent states: "In another separate object of the present invention the new healthcare management system should utilize existing legacy applications already established at health care enterprises." '647 Patent at col. 2 ll. 55-58. Here, the specification explains that the present invention utilizes legacy applications that are "existing" applications already established at the enterprises. This strongly supports Cerner's proposed construction.

CliniComp argues that the Court should not import limitations from a preferred embodiment described in the specification into the claims. (Doc. No. 72 at 10.) "'[I]t is improper to read limitations from a preferred embodiment described in the specification— even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.'" GE Lighting Sols., LLC v. AgiLight, Inc., 750 F.3d 1304, 1309 (Fed. Cir. 2014). But, here, there is a clear indication that the claims should be so limited. The Federal Circuit has explained that "[w]hen a patentee 'describes the features of the "present invention" as a whole,' he alerts the reader that 'this description limits the scope of the invention.'" Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021, 1025 (Fed. Cir. 2015); accord Regents of Univ. of Minnesota v. AGA Med. Corp., 717 F.3d 929, 936 (Fed. Cir. 2013); Luminara Worldwide, LLC v. Liown Elecs. Co., 814 F.3d 1343, 1353 (Fed. Cir. 2016). In the cited passage, the specification is not merely describing a preferred embodiment. Rather, it is describing the invention as a whole, and the specification explains that it is an object of the invention that it utilizes "existing" legacy applications already established at the enterprises. '647 Patent at col. 2 ll. 55-58.

That this language in the specification constitutes a disclaimer of claim scope is further supported by an additional passage in the specification. In describing the background of the invention, the specification states that it is "desirable that existing legacy applications, computers, and networks cooperate with the new system." '647 Patent at col.

2 ll. 44-46.   Here, the specification describes cooperating with "existing" legacy applications as a desirable feature of the new system.   The Federal Circuit has found disclaimer where the specification describes a feature as an important feature of the invention.   See Pacing Techs., 778 F.3d at 1024–25.   The disclaimer is further supported by the fact that every disclosure in the specification referencing a legacy application describes it as an existing or retained application.[13]   See '647 Patent at col. 3 ll. 12-13, col. 4 ll. 48-51, col. 8 ll. 31-36, col. 13 ll. 6-8, col. 13 ll. 20-23.   In sum, the specification contains a clear disclaimer of claim scope that supports Cerner's proposed construction requiring that the legacy application is currently in operation at the facility.

Indeed, Cerner's proposed construction incorporating this disclaimer is consistent with the Federal Circuit's understanding of the '647 Patent.   In its decision, the Federal Circuit stated: "The healthcare management system described in the '647 patent allows healthcare enterprises to preserve existing legacy applications while simultaneously phasing in new or updated applications on the same system."   Cerner, 852 F. App'x at 532 ("The purpose of the '647 patent is to allow healthcare enterprises to consolidate legacy software applications and new software applications together on one software platform.").   Here, the Federal Circuit describes the invention in the '647 Patent as utilizing "existing legacy applications."   Id.

As a result, the Court adopts Cerner's proposed construction for this claim term.[14]   The Court construes the claim term "operating at" as "in operation at."

///

///

---

[13]   The Court notes that CliniComp has not identified one disclosure in the specification where the legacy application is not an existing or retained application.

[14]   Cerner also argues that the prosecution history, specifically statements made by CliniComp during the IPR proceedings, also supports its proposed construction.   (Doc. No. 71 at 24-25.)   Because Cerner's proposed construction is supported by the clear disclaimer contained in the specification, the Court need not analyze the prosecution history for additional support.

1

## III.   CONCLUSION

2          Accordingly, the Court hereby adopts the constructions set forth above.

3          IT IS SO ORDERED.

4  Dated:  July 28, 2022

5                                              Hon. Gonzalo P. Curiel

6                                              United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28