UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINICOMP INTERNATIONAL, INC.,<br><br>                                    Plaintiff,<br><br>v.<br><br>CERNER CORPORATION,<br><br>                                    Defendant. | Case No.:  17-cv-02479-GPC (DEB)<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT; AND**<br><br>**[Dkt. No. 99.]**<br><br>**(2) DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUR-REPLY**<br><br>**[Dkt. No. 112.]** |

On September 19, 2022, Defendant Cerner Corporation ("Cerner") filed a motion for summary judgment of non-infringement. (Dkt. No. 99.)  On October 14, 2022, Plaintiff CliniComp International, Inc. ("CliniComp") filed a response in opposition to Cerner's motion for summary judgment. (Dkt. No. 106.)  On October 21, 2022, Cerner filed a reply. (Dkt. No. 109.)  On October 28, 2022, CliniComp filed a motion for leave to file a sur-

1

reply.  (Dkt. No. 112.)  On November 1, 2022, Cerner filed an opposition to CliniComp's motion for leave to file a sur-reply.  (Dkt. No. 116.)

The Court held a hearing on Cerner's motion for summary judgment on November 8, 2022.  Amardeep Thakur, Bruce Zisser, and Shawn McDonald appeared for Plaintiff CliniComp.  Jared Bobrow and Jason Yu appeared for Defendant Cerner.  For the reasons set forth below, the Court grants Cerner's motion for summary judgment of non-infringement.  In addition, the Court denies CliniComp's motion for leave to file a sur-reply.

## I.    BACKGROUND

CliniComp is the owner of U.S. Patent No. 6,665,647 ("the '647 Patent") by assignment.  (Dkt. No. 1, Compl. ¶ 2.)  In the present action, CliniComp alleges that Cerner directly infringes claims 1, 2, 5, 10-13, 15-18, and 20-23 of the '647 Patent by making, using, selling, and/or offering to sell within the United States Cerner's CommunityWorks, PowerWorks, and Lights on Network services (collectively "the accused services").  (Dkt. 103, Ex. 2 at 21; see also Dkt. No. 1, Compl. ¶¶ 15-16.)

CommunityWorks and PowerWorks are two delivery services for Cerner's primary electronic health records (EHR) platform, Millennium.  (See Dkt. No. 99-1 at 8; Dkt. No. 106 at 2.)  Lights On Network ("LON") is a cloud-based solution that "provides enterprise-level data analytics" for Millennium customers.  (Dkt. No. 108-9, Ex. J; Dkt. No. 103, Ex. 8).)

The '647 Patent is entitled "Enterprise Healthcare Management System and Method of Using Same."  U.S. Patent No. 6,665,647, at [54] (filed Dec. 16, 2003).  The Federal Circuit described the '647 Patent as follows:

> The '647 patent describes a healthcare management system for healthcare enterprises.  The purpose of the '647 patent is to allow healthcare enterprises to consolidate legacy software applications and new software applications together on one software platform.  Many healthcare enterprises utilize legacy systems for managing data related to a variety of uses, including patient care, accounting, insurance, and administrative functions.  These established systems are often outdated and too inflexible to support healthcare

2

enterprises in the "modern managed care environment." '647 patent at col. 1 ll. 58–62. The healthcare management system described in the '647 patent allows healthcare enterprises to preserve existing legacy applications while simultaneously phasing in new or updated applications on the same system.

The enterprise healthcare management system in the '647 patent allows enterprises to "remotely host[] . . . turnkey health care applications" and "provide[s] . . . enterprise users access to the turnkey applications via a public network." Id. at col. 2 ll. 61–65. Enterprises can upgrade existing capabilities and add functionality not available in their current system without significant capital investments. Because the applications are hosted on a public network (*i.e.*, the internet), the healthcare enterprise only needs computing resources sufficient to allow secure, quality access to the internet. The "turnkey" management system adjusts to changes within the enterprise as the system "easily and cost-effectively scales" to respond to an enterprise's needs. Id. at col. 3 ll. 19–23.

The information collected by the enterprise from its applications may be stored in a searchable database. Specifically, the '647 patent discloses a clinical data repository that stores information from applications within the suite of applications on the system. The clinical data repository stores "multidisciplinary information on a wide variety of enterprise functions." Id. at col. 6 ll. 31–40. For example, the clinical data repository stores pharmaceutical, radiology, laboratory, and clinical information data utilized by other applications of the application suite.

The '647 patent discloses that "the clinical data repository is a database that is partitioned" and that "the database portion may be configured as either a logical partition or a physical partition." Id. at col. 9 ll. 60–64. The healthcare management system is also capable of supporting multiple enterprises, in which case "the information related to each of the separate healthcare enterprises is stored in a separate partition of the database." Id. at col. 10 ll. 6–10. As such, when multiple enterprises are involved with using the system, the clinical data repository may have multiple partitions, with each partition holding healthcare management information for the respective enterprise.

Among other things, the '647 patent describes the partitioning of data for multiple enterprises so as to allow the storing of "[the] first healthcare data in a first portion of the database associated with the first healthcare enterprise facility" and separately storing "[the] second healthcare data in a second portion of the database associated with the second healthcare enterprise facility." Id. at col. 14 ll. 24–29. The system allows two (or more) independent healthcare enterprises to share access to certain applications

while maintaining sole access to their respective unique healthcare applications.  The databases are effectively "partitioned" or "portioned" in this way.

Cerner Corp. v. Clinicomp Int'l, Inc., 852 F. App'x 532, 532–33 (Fed. Cir. 2021).

Independent claim 1 of the '647 Patent, the only independent claim asserted by CliniComp in this action,[1] recites:

1.  A method of operating an enterprise healthcare management system for a first healthcare enterprise facility and a second healthcare enterprise facility independent of the first healthcare enterprise facility, comprising:

establishing a first secure communication channel via a public network between an application server and a first end user device in the first enterprise facility and establishing a second secure communication channel via the public network between the application server and a second end user device in the second enterprise facility, the application server remotely hosting a healthcare application and having a database;

receiving first healthcare data from the first end user and second healthcare data from the second end user;

processing the first healthcare data and the second healthcare data with the healthcare application;

storing the processed first healthcare data in a first portion of the database associated with the first healthcare enterprise facility and storing the processed second healthcare data in a second portion of the database associated with the second healthcare enterprise facility;

configuring the database to accept legacy information derived from a legacy application operating at each of the first and second healthcare enterprise facilities, wherein the functions in the healthcare application are not duplicative of the legacy application; and

generating a query to extract information from the database relevant to a respective one of the first and second healthcare enterprise facilities derived from the healthcare data and the legacy information for managing and tracking a performance of the respective one of the first and second healthcare enterprise facilities,

wherein healthcare data in the first portion of the database is only accessible

---

[1]    (See Dkt. No. 103, Ex. 2 at 2.)

to the first end user device and healthcare data in the second portion of the database is only accessible to the second end user device.

'647 Patent col. 14 ll. 8-45.

On December 11, 2017, CliniComp filed a complaint for patent infringement against Defendant Cerner, alleging infringement of the '647 Patent.  (Dkt. No. 1, Compl.)  On May 16, 2018, the Court granted Cerner's motion to dismiss Clinicomp's claims for willful infringement and indirect infringement as well as the relief sought in connection with these claims of injunctive relief, treble damages, and exceptionality damages.  (Dkt. No. 18 at 21.)  On June 25, 2018, Cerner filed an answer to CliniComp's complaint.  (Dkt. No. 19.)

On March 5, 2019, the Patent Trial and Appeal Board ("PTAB") instituted an *inter partes* review ("IPR") as to claims 1-25 and 50-55 of the '647 Patent.  (Dkt. No. 30-1, Ex. A.)  On March 7, 2019, the Court granted a stay of the action pending completion of the IPR proceedings.  (Dkt. No. 31.)  On March 26, 2020, the PTAB issued a final written decision, determining that claims 50-55 of the '647 Patent are not patentable in light of the prior art, but that claims 1-25 of the '647 Patent are patentable.[2]  (Dkt. No. 32, Ex. A at 93-94.)  On April 20, 2021, the Federal Circuit affirmed the PTAB's determination that claims 1-25 of the '647 Patent are patentable.[3]  (Dkt. No. 38-2, Ex. B at 10.)  On June 24, 2021, the Court granted the parties' joint motion to lift the stay of the action.  (Dkt. No. 44.)

On July 23, 2021, Cerner filed an amended answer to CliniComp's complaint.  (Dkt.

---

[2]     Specifically, the PTAB concluded that Cerner had shown by a preponderance of the evidence that: (1) claims 50-52 are not patentable based on Evans; (2) claims 53 and 54 are not patentable based on Evans and Rai; (3) claims 50-53, and 55 are not patentable based on Johnson and Evans; and (4) claim 54 is not patentable based on Johnson, Evans, and Rai.  (Dkt. No. 32, Ex. A at 93-94.)  The PTAB further concluded that Cerner had not shown by a preponderance of the evidence: (1) that claims 1-5, 10-13, and 15-25 are unpatentable based on Johnson and Evans; or (2) that claims 6-9, and 14 are unpatentable based on Johnson, Evans, and Rai.  (Id. at 93.)

[3]     On November 15, 2021, the PTO issued an *inter partes* review certificate for the '647 Patent, stating: "Claims 1-25 are found patentable" and "Claims 50-55 are cancelled." (Dkt. No. 71-2, Ex. A at A-20–A-21.)

No. 52.)  On October 7, 2021, the Court issued a scheduling order in the action.  (Dkt. No. 55.)

On July 28, 2022, the Court issued a claim construction order, construing the disputed claim terms from the '647 Patent.  (Dkt. No. 91.)  By the present motion, Cerner moves for summary judgment of non-infringement of the '647 Patent.  (Dkt. No. 99-1 at 25.)

## II.    DISCUSSION

## I.    Legal Standards

### A.    Legal Standards Governing Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Material facts are facts that, under the governing substantive law, may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Id.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact.  Celotex, 477 U.S. at 323.  A moving party without the ultimate burden of proof at trial can satisfy its burden in two ways: (1) by presenting "evidence negating an essential element of the nonmoving party's claim or defense;" or (2) by demonstrating "that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party establishes the absence of a genuine dispute as to any material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  T.W. Elec. Serv.,

809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007).  To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings."  Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings.").  Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a motion for summary judgment, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).  The court should not weigh the evidence or make credibility determinations.  See Anderson, 477 U.S. at 255.  "The evidence of the non-movant is to be believed."  Id.  Further, the court may consider other materials in the record not cited to by the parties, but it is not required to do so.  See Fed. R. Civ. P. 56(c)(3); see also Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010) ("[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact.'").

B.      Legal Standards Governing Patent Infringement

A patent infringement analysis proceeds in two steps.  Niazi Licensing Corp. v. St. Jude Med. S.C., Inc., 30 F.4th 1339, 1350 (Fed. Cir. 2022); JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1329 (Fed. Cir. 2005).  In the first step, the court construes the asserted claims as a matter of law.  See Niazi, 30 F.4th at 1351; JVW, 424 F.3d at 1329.  In the second step, the factfinder compares the properly construed claims to the accused method or device.  See id.

"'The patentee bears the burden of proving infringement by a preponderance of the evidence.'"  Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1314 (Fed. Cir. 2011).  To establish infringement of a method claim, "a patentee must prove that each and every step of the method or process was performed."  Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1362 (Fed. Cir. 2013); see Akamai Techs., Inc. v. Limelight Networks, Inc., 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc) ("Direct

infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity."); Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1378 (Fed. Cir. 2011) ("To prove infringement, a plaintiff must prove the presence of each and every claim element or its equivalent in the accused method or device.").

Under the doctrine of equivalents, "a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner–Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997); accord Eagle Pharms. Inc. v. Slayback Pharma LLC, 958 F.3d 1171, 1175 (Fed. Cir. 2020). The Federal Circuit "applies two articulations of the test for equivalence." Voda v. Cordis Corp., 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing Warner–Jenkinson, 520 U.S. at 40); see UCB, Inc. v. Watson Lab'ys Inc., 927 F.3d 1272, 1284 (Fed. Cir. 2019). Under the insubstantial differences test, "'[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial.'" UCB, 927 F.3d at 1284 (quoting Voda, 536 F.3d at 1326). "Alternatively, under the function-way-result test, an element in the accused device is equivalent to a claim limitation if it 'performs substantially the same function in substantially the same way to obtain substantially the same result.'" Voda, 536 F.3d at 1326 (quoting Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1209–10 (Fed. Cir. 2001)); see Ajinomoto Co. v. Int'l Trade Comm'n, 932 F.3d 1342, 1356 (Fed. Cir. 2019). "Regardless how the equivalence test is articulated, 'the doctrine of equivalents must be applied to individual limitations of the claim, not to the invention as a whole.'" Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir. 2012) (quoting Warner–Jenkinson, 520 U.S. at 29).

"'Infringement, whether literal or under the doctrine of equivalents, is a question of fact.'" Advanced Steel Recovery, LLC v. X-Body Equip., Inc., 808 F.3d 1313, 1317 (Fed. Cir. 2015). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused

1  device either literally or under the doctrine of equivalents." Id.

2      C.    Legal Standards Governing Claim Construction

3      Because the first step in an infringement analysis is for the Court to construe the

4  asserted claims as a matter of law, the Court sets forth the following legal standards

5  governing claim construction.  Claim construction is an issue of law for the court to decide.

6  Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 838 (2015); Markman v. Westview

7  Instr., Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question

8  of law, "subsidiary factfinding is sometimes necessary." Teva, 135 S. Ct. at 838.

9      "It is a 'bedrock principle' of patent law that the 'claims of a patent define the

10  invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp.,

11  415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  "The purpose of claim construction is to

12  'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" O2

13  Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008).

14      Claim terms "'are generally given their ordinary and customary meaning[,]'" which

15  "is the meaning that the term would have to a person of ordinary skill in the art in question

16  at the time of the invention." Phillips, 415 F.3d at 1312–13.  "In some cases, the ordinary

17  meaning of claim language as understood by a [PHOSITA] may be readily apparent even

18  to lay judges, and claim construction in such cases involves little more than the application

19  of the widely accepted meaning of commonly understood words." Id. at 1314.  "However,

20  in many cases, the meaning of a claim term as understood by persons of skill in the art is

21  not readily apparent." O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not

22  readily apparent, the court must look to "'those sources available to the public that show

23  what a person of skill in the art would have understood disputed claim language to mean.'"

24  Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,

25  Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the

26  claims themselves, the remainder of the specification, the prosecution history, and extrinsic

27  evidence.'" Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc.,

28  773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims."  Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc); accord Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 632 F.3d 1246, 1256 (Fed. Cir. 2011).  Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  Id.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id.  "Yet because the prosecution history represents an ongoing negotiation

between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. See Vitronics, 90 F.3d at 1583; Teva, 135 S. Ct. at 841; see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. Phillips, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); see also Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." Teva, 135 S. Ct. at 841.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." O2 Micro, 521 F.3d at 1362; see also Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"). In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. See O2 Micro, 521 F.3d at 1360; Phillips, 415 F.3d at 1314. But "[a] determination that a claim

term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." <u>O2 Micro</u>, 521 F.3d at 1361.  When the parties present a dispute regarding the scope of a claim term, it is the court's duty to resolve the dispute.  <u>Id.</u> at 1362; <u>Eon</u>, 815 F.3d at 1318.

## II.   Federal Rule of Civil Procedure 56(d)

As an initial matter, CliniComp argues that Cerner's motion for summary judgment should be denied as premature.  (Dkt. No. 106 at 2.)  CliniComp notes that it has not taken Rule 30(b)(6) depositions or received documents in response to several third-party subpoenas, and expert discovery has not even begun.  (<u>Id.</u>)  In response, Cerner argues that its motion is not premature, and the mere fact that the fact-discovery period in this action has not expired is not a basis to deny summary judgment.  (Dkt. No. 109 at 10.)

Federal Rule of Civil Procedure 56(d) provides "a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence."  <u>United States v. Kitsap Physicians Serv.</u>, 314 F.3d 995, 1000 (9th Cir. 2002) (discussing former Rule 56(f), which is now Rule 56(d)).  Rule 56(d) provides in full: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).

To prevail under Rule 56(d), a party requesting a continuance "must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment."  <u>Tatum v. City & Cnty. of San Francisco</u>, 441 F.3d 1090, 1100 (9th Cir. 2006); <u>see also</u> <u>Blough v. Holland Realty, Inc</u>, 574 F.3d 1084, 1091 n.5 (9th Cir. 2009) ("To prevail under this Rule, parties opposing a motion for summary judgment must make '(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." (internal quotation marks omitted)).  "Failure to comply with these requirements

'is a proper ground for denying discovery and proceeding to summary judgment.'" Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir. 2008). "The party seeking a Rule 56(d) continuance bears the burden of proffering facts sufficient to satisfy the requirements of 56(d)." Martinez v. Columbia Sportswear USA Corp., 553 F. App'x 760, 761 (9th Cir. 2014) (citing Nidds v. Schindler Elevator Corp., 113 F.3d 912, 921 (9th Cir. 1996)).

Here, CliniComp has failed to even attempt to satisfy the requirements of Rule 56(d). Indeed, CliniComp does not even invoke Rule 56(d). (See Dkt. No. 106 at 2.) CliniComp has not presented the Court with an affidavit or declaration identifying any specific facts that further discovery would reveal and explaining why those facts would preclude summary judgment of non-infringement. CliniComp simply notes in its motion that it has not taken Rule 30(b)(6) depositions or received documents in response to several third-party subpoenas, and expert discovery has not begun. (Dkt. No. 106 at 2.) CliniComp does not assert that any of this anticipated discovery would reveal any specific additional facts that are "essential" to its opposition to Cerner's motion for summary judgment of non-infringement. See Sec. & Exch. Comm'n v. Stein, 906 F.3d 823, 833 (9th Cir. 2018) (explaining that "[t]he facts sought must be 'essential' to the party's opposition to summary judgment"). As such, CliniComp has failed to satisfy the requirements of Rule 56(d), and, therefore, the Court rejects CliniComp's argument that Cerner's motion for summary judgment of non-infringement is premature. See Tatum, 441 F.3d at 1100 ("Because [plaintiff] did not satisfy the requirements of Rule 56(f), the district court did not abuse its discretion by denying her request for a continuance."); see also, e.g., Rosebud LMS Inc. v. Adobe Sys. Inc., 812 F.3d 1070, 1076 (Fed. Cir. 2016) (rejecting appellant's argument that summary judgment was premature where appellant failed to indicate that "it needed further discovery on issues relevant to the motion").

## III.   Infringement Analysis

Cerner argues that it is entitled to summary judgment of non-infringement because the accused services do not satisfy three limitations contained in independent claim 1 of

the '647 Patent, the only independent claim asserted in this action.  (Dkt. No. 99-1 at 25.)
Specifically, Cerner argues that the accused services do not satisfy the "the only accessible
to . . ." limitation; the "storing . . ." limitation; and the "configuring the database . . ."
limitation in claim 1.  (Id. at 1-3, 12-24.)   The Court addresses each of these three
limitations below.

> A.   The "Only Accessible To . . ." Claim Limitation

Cerner argues that it is entitled to summary judgment of non-infringement because
the accused services do not satisfy the "only accessible to the [first/second] end user
device" "in the [first/second] enterprise facility" limitation in independent claim 1 of the
'647 Patent.  (Dkt. No. 99-1 at 12-16; Dkt. No. 109 at 1-4.)  In response, CliniComp argues
that Cerner's theory of non-infringement fails because it is based on a claim construction
that the Court never entered.  (Dkt. No. 106 at 5-7.)

Independent claim 1 of the '646 Patent recites:

1. A method of operating an enterprise healthcare management system for a
first healthcare enterprise facility and a second healthcare enterprise facility
independent of the first healthcare enterprise facility, comprising:

establishing a first secure communication channel via a public network
between an application server and **a first end user device in the first
enterprise facility** and establishing a second secure communication channel
via the public network between the application server and **a second end user
device in the second enterprise facility**, the application server remotely
hosting a healthcare application and having a database;

. . .

**wherein healthcare data in the first portion of the database is only
accessible to the first end user device and healthcare data in the second
portion of the database is only accessible to the second end user device.**

'647 Patent col. 14 ll. 8-19, 42-45 (emphasis added).  In the claim construction order, the
Court construed the claim term "wherein healthcare data in the first portion of the database
is only accessible to the first end user device and healthcare data in the second portion of
the database is only accessible to the second end user device" as "wherein the portioning
of the database enables restricting access such that healthcare data stored in the first portion

of the database cannot be accessed by any device other than the first end user device(s) and healthcare data stored in the second portion of the database cannot be accessed by any device other than the second end user device(s)." (Dkt. No. 91 at 31-32.)

Cerner argues that the claim language in the "wherein" clause of claim 1 combined with the claim language in the "establishing" clause of claim 1 requires that the healthcare data associated with the first enterprise facility can only be accessed by first end user devices in the first enterprise facility. (Dkt. No. 99-1 at 12-13.) And, similarly, it requires that the healthcare data associated with the second enterprise facility can only be accessed by second end user devices in the second enterprise facility. (Id. at 13.) The Court agrees that this is a proper reading of the claim language, and, thus, independent claim 1 includes as a limitation that the healthcare data is "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility." See '647 Patent col. 14 ll. 42-43 ("wherein healthcare data in the first portion of the database is only accessible to the first end user device"), col. 14 ll. 13-14 ("a first end user device in the first enterprise facility"). (See also Dkt. No. 91 at 28 ("[C]laim 1 further recites 'a first end user device in the first enterprise facility' and 'a second end user device in the second enterprise facility.' And claim 1 further states that it is these user devices that have sole access to the respective portions of the databases." (citations omitted))

Cerner argues the accused services do not satisfy this "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility" limitation as a matter of law because it is undisputed that the accused services permit health information to be accessed by any device with an Internet connection at any location. (Dkt. No. 99-1 at 13-16.) In response, CliniComp argues that Cerner's non-infringement argument fails because it is based on a claim construction ruling that the Court never made. (Dkt. No. 106 at 6.) CliniComp notes that during claim construction neither party asked the Court to construe the relevant claim term: "in the [first/second] enterprise facility." (Id.)

In the parties' summary judgment briefing, the parties present a clear dispute as to the proper scope of the claim term "a [first/second] end user device in the [first/second]

enterprise facility" in independent claim 1 of the '647 Patent.  (Compare Dkt. No. 106 at 6-7 with Dkt. No. 109 at 1-3.)  The parties should have presented this claim construction dispute to the Court during the claim construction phase of the case and not at summary judgment.  "Sound practical reasons counsel against construing additional terms based on claim construction arguments raised for the first time in summary judgment briefs."  Apple, Inc. v. Samsung Elecs. Co., No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014); see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 467 F.3d 1355, 1364 (Fed. Cir. 2006) (explaining that patent local rules are designed to "prevent the shifting sands approach to claim construction" (internal quotation marks omitted)).  Indeed, generally, a party waives any argument with respect to the construction of a claim term when they fail to raise that issue during the claim construction phase of the case.  See Finalrod IP, LLC v. John Crane, Inc., No. 7:15-CV-00097-ADA, 2019 WL 4061703, at *2 (W.D. Tex. May 30, 2019) ("The Federal Circuit holds that an accused infringer waives any argument with respect to the construction of a claim term when they fail to raise that issue during the claim construction phase of a patent infringement action."); see, e.g., Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found that ACS waived any argument with respect to th[e] term ["maintaining"] by failing to raise it during the claim construction phase.  We agree."); Apple, 2014 WL 252045, at *3 ("If the parties wanted to tee up summary judgment positions based on particular constructions, they 'could (and should) have sought . . . construction[s] to [those] effect[s].'").

Nevertheless, on this record, the Court declines to find that Cerner waived its arguments with respect to the claim term "a [first/second] end user device in the [first/second] enterprise facility."  As explained below, Cerner's position is supported by the plain and ordinary meaning of the claim language.  See infra.  In addition, in the parties' February 14, 2022 joint claim construction chart, Cerner set forth in an impact statement its contention that the accused services do not satisfy the limitations in independent claim 1 because: (1) the claim language does not permit access by "devices that are not 'in the

[first/second] enterprise facility;'" and (2) the accused services allow healthcare data to be accessed "on different devices and . . . by personnel beyond a single enterprise." (Dkt. No. 63-1 at A14–A15.)   Thus, this particular non-infringement contention was raised to CliniComp during the claim construction phase of the case well in advance of the filing of the parties' claim construction briefs.  In light of this, CliniComp, not Cerner, bore the burden of raising this issue to the Court during the claim construction phase of the case. Accordingly, because the parties dispute the scope of the claim term "a [first/second] end user device in the [first/second] enterprise facility," it is the Court's duty to resolve that dispute.  See O2 Micro, 521 F.3d at 1362; Eon, 815 F.3d at 1318.

Here, Cerner contends that this claim term requires that the user device be physically located in the healthcare enterprise's facilities.  (Dkt. No. 109 at 1-3; see also Dkt. No. 99-1 at 13, 15.)  In response, CliniComp argues that the claim term permits "the user and user device [to] be remote from the healthcare enterprise."  (Dkt. 106 at 6.)  CliniComp argues that the Court's construction for this claim term should not restrict the user devices to any particular physical location or building.  (Id. at 7.)

The Court begins its analysis of the parties' dispute by reviewing the claim language. Independent claim 1 of the '647 Patent recites: "a [first/second] end user device in the [first/second] enterprise facility."  '647 Patent col. 14 ll. 13-14.  The plain and ordinary meaning of the word "in" in this context is to indicate "location or position within something."   THE BRITANNICA DICTIONARY,  https://www.britannica.com/dictionary/in (defining "in" as "used to indicate location or position within something"); see MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/in (defining "in" as "used as a function word to indicate inclusion, location, or position within limits"); see also Phillips, 415 F.3d at 1314 (explaining that the use of general purposes dictionaries "may be helpful" in cases that involve "little more than the application of the widely accepted meaning of commonly understood words").  And the plain and ordinary meaning of the word "facility" in this context is something (such as a building) that is built for a specific purpose.   See THE BRITANNICA DICTIONARY,  https://www.britannica.com/dictionary/

facility (defining "facility" as "something (such as a building or large piece of equipment) that is built for a specific purpose"); MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/facility (defining "facility" as "something (such as a hospital) that is built, installed, or established to serve a particular purpose"); CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/facility (defining "facility" as "a place, especially including buildings, where a particular activity happens").  As such, the claim language supports Cerner's contention that the term "device in the [first/second] enterprise facility" requires that the claimed device be physically located within the healthcare enterprise's physical locations (i.e., the healthcare enterprise's hospitals or other buildings).

Turning to the specification, CliniComp argues: "One of the key features of the '647 patent is the fact the user and the user device may be remote from the healthcare enterprise."  (Dkt. No. 106 at 6.)  CliniComp is mistaken and that contention is not supported by the specification.  When the specification uses the word "remote," it does so only to describe the remote hosting of the applications (i.e., that the applications and the application server are remote from the healthcare enterprise and its users).  The specification never describes the users or user devices as being remote from the healthcare enterprise.  For example, the specification states: "The enterprise healthcare management system and method includes remotely hosting turnkey health care applications and providing enterprise users access to the turnkey applications via a public network such as the Internet."  '647 Patent col. 2 ll. 61-65; accord id. at [57] (Abstract); see also id. at col. 3 ll. 2 ("the turnkey applications are remotely hosted"), col. 4 ll. 20-22 ("This turnkey solution operates at a single location remote from the healthcare enterprise."), col. 4 ll. 25-26 ("the enterprise is using the Internet to access the remotely hosted applications"), col. 8 ll. 31 ("remote applications"), col. 12 ll. 61-63 ("That application server remotely hosts turnkey healthcare management application suites."), col. 13 ll. 43-44 ("the application server remotely hosts the suite of health care applications").  In an effort to support its argument, CliniComp notes that in one passage the specification uses the term "remote

user." (Dkt. No. 106 at 6.)  In the cited passage, the specification states:  "Such a redundant system linking to the Internet at a major point of presence provides an extremely high quality of service for any remote user accessing the application server 24."  '647 Patent col. 4 ll. 1-4.  But, here, the specification is again only referring to the application server being "remote" from the user, not that the user is remote from the healthcare enterprise.

Further, the specification always refers to the healthcare enterprises as being comprised of physical healthcare facilities (for example, hospitals and point-of-care facilities).  See, e.g., '647 Patent col. 1 ll. 33-36 ("Health care enterprises can be expansive, encompassing hundreds of doctors and many point of care facilities, or can be more modest in size.  Indeed, many health care enterprises consist of only a single facility such as a hospital."), col. 4 ll. 6-7 ("Healthcare enterprises are established in differing physical and administrative configurations."), col. 7 ll. 56-58 ("The single facility enterprise 14 is typically a single stand-alone hospital."), col. 8 ll. 46-49 ("A healthcare enterprise may comprise[] several point of care facilities interconnected with an intranet.  For example, intranet enterprise 16 comprises hospital 102, hospital 103, and hospital 104 connected with the intranet 123.  Although the intranet enterprise 16 is shown having separate hospital facilities, these point of care facilities may also include clinics, laboratories, or pharmacies."), col. 8 ll. 67 to col. 9 ll. 4 ("The widely distributed enterprise 18 has point of care facilities geographically dispersed with no or limited computer interconnection.  For example, widely distributed enterprise 18 shows four point of care hospitals 90-93.").[4]  In addition, the specification always refers to the user or the user device as being physically inside the facilities.  See, e.g., '647 Patent col. 4 ll. 22-24 ("Via the Internet, users at

---

[4]    At the hearing, CliniComp argued that the specification's use of the phrase "point of care facilities" supports its claim construction position because a point of care facility could include a doctor's home office via remote access to the system.  The Court disagrees.  The specification contains no such disclosure.  Rather, as shown in the above passages, when the specification identifies "point of care facilities," it only identifies "hospital[s]," "clinics, laboratories, [and] pharmacies."  See '647 Patent col. 8 ll. 46-49, col. 9 ll. 1-4.

1   healthcare enterprises interactively access applications in the suite 26 to perform patient,

2   financial, or administrative tasks."), col. 6 ll. 60-61 ("a user at the nurse station device 75

3   of the single facility enterprise 14"), col. 8 ll. 10 ("a nurse at nurse station device 75"), col.

4   8 ll. 12-13 ("In a similar manner there may be a bedside device 77."), col. 8 ll. 16-17 ("The

5   single facility enterprise 14 also has automated monitoring devices such as fetal monitor

6   70.  The fetal monitor device 70 has a fetal monitor 73 attached to a patient."), col. 12 ll.

7   7-8 ("A caregiver at the point of care facility then collects updated patient specific

8   information . . . ."), col. 13 ll. 24-27 ("[U]sers at the healthcare enterprise can interactively

9   use applications hosted on the application server for performing day-to-day patient and

10  administrative functions for the healthcare enterprise.").  As such, the specification does

11  not support and indeed contradicts CliniComp's contention that a key feature of the '647

12  Patent is that the user and the user device may be remote from the healthcare enterprise.

13  Rather, the specification – consistent with the plain and ordinary meaning of the claim

14  language – supports Cerner's position that the user device must be physically located

15  within a healthcare enterprise facility.[5]

16          In sum, Cerner's claim construction position is well supported by the plain and

17  ordinary meaning of the claim language and the specification of the '647 Patent.  As such,

18  the Court adopts Cerner's claim construction position, and the Court rejects CliniComp's

19  claim construction position.  The Court construes that claim term "a [first/second] end user

20  device in the [first/second] enterprise facility" as "the [first/second] end device is

21  physically located within a [first/second] healthcare enterprise facility."

22          With that claim construction issue resolved, it is clear that the accused services do

23

24  _____

25  [5]      The Court is mindful of its obligation not to import limitations from preferred

26  embodiments described in the specification into the claims.  See Dealertrack, 674 F.3d at
    1327; Openwave, 808 F.3d at 514.  But that is not what the Court is doing here.  Rather,

27  the Court is simply noting that the specification is consistent with the plain and ordinary
    meaning of that relevant claim language, and the specification contradicts CliniComp's

28  claim construction position, which deviates from that plain and ordinary meaning.

not satisfy the "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility" limitation under a literal infringement analysis as a matter of law. The plain language of claim 1 states that the claimed "healthcare data" is "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility." See '647 Patent col. 14 ll. 14-18, 42-45. Under the Court's construction of the relevant claim terms,[6] that limitation requires that an enterprise's healthcare data is only accessible to user devices physically located inside that healthcare enterprise's facilities.

Cerner has presented the Court with evidence showing that the accused services allow for healthcare data to be accessed by any device with an internet connection at any location. (See Dkt. No. 103 at 1-4; Dkt No. 103, Ex. 4 at 119 ("It's all running remotely through Citrix so they can log in from anywhere. I could be at a hospital in Oklahoma, you know, and I would log in the same way as if I was visiting Hawaii."); Ex. 6 at 138 ("Any device that has an internet application would be able to access Lights On, so laptop, phone, tablet, just as long as you can get to an internet site, and you have, of course, a Cerner Care account, you'd be able to get into Lights On.").) CliniComp does not dispute this evidence. Indeed, at the hearing, CliniComp conceded that the digital workspace utilized by the accused services is not restricted to any particular location.[7] In addition, CliniComp's own expert, Mr. Davis, states that the CommunityWorks and PowerWorks accused services

---

[6]    The claim term "wherein healthcare data in the first portion of the database is only accessible to the first end user device and healthcare data in the second portion of the database is only accessible to the second end user device" and the claim term "a [first/second] end user device in the [first/second] enterprise facility."

[7]    In its Statement of Disputed Material Facts in Response to Cerner's Separate Statement of Undisputed Material Facts, CliniComp notes that when users access the accused services, "they experience the same digital workspace regardless of their physical location." (Dkt. No. 108 at 1, 5.) But even assuming that is true, that is insufficient to satisfy the relevant claim language under the Court's claim constructions, which requires that the claimed device be physically located within the relevant healthcare enterprise's facilities.

utilize Citrix Workspace, which "delivers secure and unified access to apps, desktops, and content (resources) *from anywhere, on any device*." (Dkt. No. 108-16, Davis Decl. ¶¶ 13-14 (emphasis added).) Mr. Davis also states that the Lights On accused services "is a web application [and] is available via https://lightson.cerner.com." (Id. ¶ 27.) As such, it is undisputed that the accused services permit devices to access a healthcare enterprise's healthcare information from locations physically outside the enterprise's facilities. Under those undisputed facts, no reasonable jury could conclude that the accused services literally satisfy the "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility" claim limitation. As such, Cerner has demonstrated by undisputed facts that the accused services do not literally infringe claim 1 of the '647 Patent. See Aristocrat, 709 F.3d at 1362 (explaining that to establish infringement of a method claim, "a patentee must prove that each and every step of the method or process was performed").

In a footnote, CliniComp contends that a reasonable jury could find the "only accessible to . . ." claim limitation to be present in the accused services under the doctrine of equivalents. (Dkt. No. 106 at 9 n.6.) In response, Cerner argues that CliniComp cannot rely on the doctrine of equivalents because CliniComp never asserted doctrine of equivalents theories in its infringement contentions. (Dkt. No. 99-1 at 24-25; Dkt. No. 109 at 4.)

"The Court's Patent Local Rules 'are designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed.'" Wi-LAN Inc. v. LG Elecs., Inc., No. 18-CV-01577-H-BGS, 2019 WL 5790999, at *2 (S.D. Cal. Sept. 18, 2019) (quoting Nova Measuring Instruments Ltd. v. Nanometrics, Inc., 417 F. Supp. 2d 1121, 1123 (N.D. Cal. 2006)); accord O2 Micro, 467 F.3d at 1366 n.12; see MyGo, LLC v. Mission Beach Indus., LLC, No. 16-CV-2350-GPC-RBB, 2018 WL 3438650, at *5 (S.D. Cal. July 17, 2018) (explaining that "the general policy rationale of the Local Patent Rules" requires "that plaintiffs crystallize their patent infringement theories in the early stages of litigation"). The Patent Local Rules accomplish this "by requiring both the plaintiff and the defendant in patent cases to provide early notice

of their infringement and invalidity contentions, and to proceed with diligence in amending those contentions when new information comes to light in the course of discovery.  The rules thus seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories."  O2 Micro, 467 F.3d at 1365–66.

"A district court has wide discretion in enforcing the Patent Local Rules." LookSmart Grp., Inc. v. Microsoft Corp., No. 17-CV-04709-JST, 2019 WL 7753444, at *2 (N.D. Cal. Oct. 17, 2019); accord Nichia Corp. v. Feit Elec. Co., Inc., No. CV 20-359-GW-EX, 2022 WL 4613591, at *3 (C.D. Cal. Feb. 15, 2022); see Howmedica Osteonics Corp. v. Zimmer, Inc., 822 F.3d 1312, 1320 (Fed. Cir. 2016) (reviewing "a district court's application of its local rules for abuse of discretion").  The Federal Circuit will "affirm decisions in which [a] district court enforced its own local rules, unless it is 'clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence.'"  Howmedica Osteonics, 822 F.3d at 1324; see also Mortg. Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1321 (Fed. Cir. 2016) ("'[T]his court defers to the district court when interpreting and enforcing local rules so as not to frustrate local attempts to manage patent cases according to prescribed guidelines.'").

Patent Local Rule 3.1(e) provides that a party's "Disclosure of Asserted Claims and Infringement Contentions" must contain the following information, among other things: "[w]hether each element of each asserted claim is claimed to be literally present and/or present under the doctrine of equivalents in the Accused Instrumentality."  S.D. Cal. Pat. L.R. 3.1(e).  Patent Local Rule 3.6(a) further provides that after the filing of the parties' Joint Claim Construction Chart, a party asserting a claim of patent infringement may only amend its infringement contentions "absent undue prejudice to the opposing party" and:

1. If, not later than thirty (30) days after service of the Court's Claim Construction Ruling, the party asserting infringement believes in good faith that amendment is necessitated by a claim construction that differs from that proposed by such party; or

2. Upon a timely motion showing good cause.

S.D. Cal. Pat. L.R. 3.6(a); see also Regents of Univ. of California v. Affymetrix, Inc., No. 17-CV-01394-H-NLS, 2018 WL 4053318, at *2 (S.D. Cal. Aug. 24, 2018) ("In contrast to the more liberal policy for amending pleadings, the philosophy behind amending contentions under the Patent Local Rules is decidedly conservative, and designed to prevent the 'shifting sands' approach to claim construction." (quoting Verinata Health, Inc. v. Ariosa Diagnostics, Inc., 236 F. Supp. 3d 1110, 1113 (N.D. Cal. 2017)).

"'In a lawsuit for patent infringement in the Southern District of California, a patentee is limited to the infringement theories it sets forth in its infringement contentions.'" Wi-LAN, 2019 WL 5790999, at *2; accord Multimedia Pat. Tr. v. Apple Inc., No. 10-CV-2618-H KSC, 2012 WL 6863471, at *14 (S.D. Cal. Nov. 9, 2012); see also LookSmart, 2019 WL 7753444, at *2 ("Once served, the infringement contentions constitute the universe of infringement theories."). Indeed, the Federal Circuit has held that a party asserting a claim of infringement waives its right to raise infringement under the doctrine of equivalents by failing to timely disclose it in its infringement contentions. See, e.g., Teashot LLC v. Green Mountain Coffee Roasters, Inc., 595 F. App'x 983, 987-88 (Fed. Cir. 2015) (affirming district court's holding that plaintiff waived its right to raise infringement under the doctrine of equivalents by failing to timely disclose it as an infringement theory its infringement contentions); see also Droplets, Inc. v. E*TRADE Fin. Corp., No. 12 CIV. 2326, 2015 WL 1062670, at *3 (S.D.N.Y. Mar. 9, 2015) ("[I]nfringement by equivalents is waived if not included in infringement contentions."); PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp., No. 16-CV-01266-EJD, 2017 WL 2180980, at *16 (N.D. Cal. May 18, 2017) ("Courts in this district have cited deficient infringement contentions as additional bases for granting summary judgment of noninfringement with respect to doctrine of equivalents.").

Following the Court's issuance of the claim construction order on July 28, 2022, CliniComp served its amended infringement contentions on Cerner on August 29, 2022. (Dkt. No. 103, Ex. 2.) In its amended infringement contentions, CliniComp does not specifically identify any claim limitations as being present in the accused services under

the doctrine of equivalents.  (See generally id. at 7-35.)  In the August 29, 2022 amended infringement contentions, CliniComp merely states: "To the extent that any element is found to be not literally present, CliniComp reserves the right to assert that each such claim element is present in the Accused Instrumentalities under the doctrine of equivalents."  (Id. at 3.)  A general reservation of the right to assert infringement under the doctrine of equivalents does "does not satisfy [a plaintiff]'s obligation to disclose its infringement analysis as required by the rules of this District Court."  Sonix Tech. Co. v. Yoshida, No. 12CV380-CAB (DHB), 2014 WL 11899474, at *3 (S.D. Cal. Dec. 12, 2014); see, e.g., PersonalWeb, 2017 WL 2180980, at *15 ("Blanket reservations of rights are not sufficient."); see also Finjan, Inc. v. Proofpoint, Inc., No. 13-CV-05808-HSG, 2015 WL 9460295, at *1 (N.D. Cal. Dec. 23, 2015) ("Such a general disclaimer would be contrary to the local rule's requirement that parties crystallize their theories early in the litigation.").  Rather, in order to properly assert an infringement theory under the doctrine of equivalents in compliance with the Court's Patent Local Rules, a patentee must provide "a limitation-by-limitation" analysis as to why and how there is infringement under the doctrine of equivalents.  See Ameranth, Inc. v. Pizza Hut, Inc., No. 12CV1627 JLS NLS, 2013 WL 3894880, at *5 (S.D. Cal. July 26, 2013); Finjan, Inc. v. Sophos, Inc., No. 14-CV-01197-WHO, 2015 WL 5012679, at *4 (N.D. Cal. Aug. 24, 2015); see also Mirror Worlds, 692 F.3d at 1357 ("'[T]he doctrine of equivalents must be applied to individual limitations of the claim, not to the invention as a whole.'").  CliniComp did not provide any such limitation-by-limitation doctrine of equivalents analysis in its infringement contentions.  (See generally Dkt. No. 103, Ex. 2 at 7-35.)  As such, CliniComp waived its right to raise doctrine of equivalents by failing to properly disclose that theory of infringement in its infringement contentions.[8]  See, e.g., Teashot, 595 F. App'x at 987-88; Sonix, 2014 WL

---

[8]      CliniComp argues that the doctrine of equivalents should remain available to it on this issue because Cerner only first disclosed its reliance on the "in" the enterprise facility claim language as a basis for non-infringement in a September 2, 2022 supplemental

11899474, at *3; <u>Droplets</u>, 2015 WL 1062670, at *3.

Further, even if the Court were to assume that CliniComp did not waive doctrine of equivalents, CliniComp's single footnote is insufficient to raise a genuine dispute of fact as to infringement under the doctrine of equivalents as to the "only accessible to . . ." claim limitation.   In the footnote, CliniComp simply argues in a conclusory manner that a reasonable jury could find the presence of this claim limitation under the doctrine of equivalents.  (Dkt. No. 106 at 9 n.6.)  CliniComp does not even attempt to analyze any of the evidence in the record under either the insubstantial differences test or the function-way-results test.  Cf. <u>Akzo Nobel Coatings, Inc. v. Dow Chem. Co.</u>, 811 F.3d 1334, 1342 (Fed. Cir. 2016) ("A patentee must establish 'equivalency on a limitation-by-limitation basis' by 'particularized testimony and linking argument' as to the insubstantiality of the differences between the claimed invention and the accused device or process.").   And CliniComp does not address Cerner's claim vitiation argument.  (<u>See</u> Dkt. No. 99-1 at 24.) <u>See</u> <u>UCB</u>, 927 F.3d at 1282 ("'Under the doctrine of equivalents, an infringement theory . . . fails if it renders a claim limitation inconsequential or ineffective.'" (quoting <u>Akzo Nobel Coatings</u>, 811 F.3d at 1342)); <u>Duncan Parking Techs., Inc. v. IPS Grp., Inc.</u>, 914 F.3d 1347, 1362 (Fed. Cir. 2019) ("the doctrine of equivalents cannot be used to effectively read out

---

interrogatory response, which was after CliniComp served its amended infringement contentions on August 29, 2022. (Dkt. No. 106 at 9 n.6.)  CliniComp's contention is not supported by the record.  In the parties' February 14, 2022 joint claim construction chart, Cerner set forth in an impact statement its contention that the accused services do not satisfy the limitations in independent claim 1 because: (1) the claim language does not permit access by "devices that are not 'in the [first/second] enterprise facility;'" and (2) the accused services allow healthcare data to be accessed "on different devices and . . . by personnel beyond a single enterprise." (Dkt. No. 63-1 at A-14–A-15; <u>see also</u> Dkt. No. 71 at 21 ("[T]he '647 Patent never describes computing devices (apart from the server) being located anywhere but the healthcare enterprise facilities."); Dkt. No. 72 at 9 ("Cerner's emphasis on the location of the user device is also misplaced.").)  Thus, this particular non-infringement contention was first raised to CliniComp more than six months prior to the service of its August 29, 2022 amended infringement contentions.

a claim limitation").

In sum, Cerner has demonstrated that the accused services do not satisfy the "only accessible to the [first/second] end user device" "in the [first/second] enterprise facility" limitation in independent claim 1 of the '647 Patent as a matter of law.  As such, Cerner has demonstrated that it is entitled to summary judgment of non-infringement as to independent claim 1 of the '647 Patent.  See Advanced Steel Recovery, 808 F.3d at 1317 (explaining "[s]ummary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents.").

B.    The "Storing . . ." Claim Limitation

Cerner argues that it is entitled to summary judgment of non-infringement because the accused services do not satisfy the "storing the processed [first/second] healthcare data in a [first/second] portion of the database associated with the [first/second] healthcare enterprise facility" limitation in independent claim 1 of the '647 Patent.  (Dkt. No. 99-1 at 12-16.)  In response, CliniComp argues that Cerner's non-infringement argument relies on an overly narrow reading of the Court's claim construction for the claim term "portion[s]," and that the processes used by the accused services satisfy each element of the Court's construction for that claim term.  (Dkt. No. 106 at 11-13.)

Independent claim 1 of the '646 Patent recites:

1. A method of operating an enterprise healthcare management system for a first healthcare enterprise facility and a second healthcare enterprise facility independent of the first healthcare enterprise facility, comprising:

. . .

**storing the processed first healthcare data in a first portion of the database associated with the first healthcare enterprise facility and storing the processed second healthcare data in a second portion of the database associated with the second healthcare enterprise facility**;

'647 Patent col. 14 ll. 8-11, 25-30 (emphasis added).  In the claim construction order, the Court construed the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility" as "a specific arrangement of data structures

of the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility, wherein the claimed [first/second] 'portion' is not created by merely identifying data or associating subsets of data with common values (*i.e.*, indexing by an identifier), and the [first/second] portion of the database is created before the claimed 'storing' of 'data' occurs, and restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare enterprise facility."[9] (Dkt. No. 91 at 17-18.)

In order to satisfy the "storing . . ." limitation, the accused services must utilize a database with "portion[s]."  See '647 Patent col. 14 ll. 25, 28.  And under the Court's claim construction and the other claim language in the "storing . . ." limitation, in order for something within the accused services to be the claimed "portion," it must meet the following five requirements:

1.  The "portion" stores processed healthcare data, see '647 Patent col. 14 ll. 25

---

[9]  The Court's construction of this claim term was primarily based on several clear and unmistakable prosecution disclaimers that CliniComp made during the IPR proceedings as to the '647 Patent.  (See Dkt. No. 91 at 12-16.)  See Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1361 (Fed. Cir. 2017) (explaining that "statements made by a patent owner during an IPR proceeding" can constitute prosecution disclaimer so long as the statements are "'both clear and unmistakable'").  Notably, during the oral hearing before the PTAB in the relevant IPR proceedings, CliniComp made several clear and detailed arguments regarding the proper scope of the "storing . . ." limitation in an effort to distinguish claim 1 of the '647 Patent from the prior art reference Johnson.  (See generally Dkt. No. 71-2, Ex. E.)  See MBO Lab'ys, Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1330 (Fed. Cir. 2007) ("Prosecution arguments like this one which draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not."); see also Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008) (explaining that a patentee may limit the scope of a claim term "by clearly characterizing the invention in a way to try to overcome rejections based on prior art").

("storing the processed first healthcare data in a first portion");[10]

2.  The "portion" is "a specific arrangement of data structures of the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility" (Dkt. No. 91 at 17);

3.  The "portion" "is not created by merely identifying data or associating subsets of data with common values (*i.e.*, indexing by an identifier)" (id.);

4.  The "portion" "is created before the claimed 'storing' of 'data' occurs" (id.); and

5.  The "portion" "restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare enterprise facility" (id. at 17-18).[11]

The parties agree that the Community Works and PowerWorks accused services are "multi-tenant" solutions in which multiple clients share and store their data in a single instance or "domain" of the Millennium database.  (See Dkt. No. 99-1 at 8-9; Dkt. No. 103, Ex. 2 at 10-11, 22; Dkt. No. 108-16, Davis Decl. ¶ 12.)  In an effort to demonstrate that the accused services satisfy the "storing . . ." limitation, CliniComp identifies the following process utilized by the accused services:

> In [CommunityWorks, PowerWorks, and LON], when a user requests information from the DBMS, programming in the database compiles the

_____

[10]   During the IPR proceedings, CliniComp's counsel explained: "You store the Scripps Health data in the first portion of the database that is associated with Scripps Health.  And you store the Sharp Medical Hospital data in the portion of the database that is associated with Sharp Medical."  (Dkt. No. 71-2, Ex. E at E-5.)

[11]   In the claim construction order, the Court also held that CliniComp made clear and unmistakable disclaimers during the IPR proceedings requiring that the claimed "portion" also be "'separate and distinct and having [its] own management.'"  (Dkt. No. 91 at 16 (quoting Dkt. No. 71-2, Ex. E at E-17).)  The Court declined to include this additional requirement into the Court's claim construction because, at the time, it was unclear as to why it was needed.  (See id. at 16-17.)

1

2

3

4

> request as a query or calls a database view, inserting the client ID, *i.e.*, logical domain ID or CDR_ID, to ensure that only data for the requesting client is retrieved.  The retrieved data is collected as a structured data object, or data blob, which is stored in memory as it passed back to the requesting user device, where the information is extracted from the data blob for display.

5

6

7

8

9

10

11

(Dkt. No. 106 at 12 (citing Dkt. No 108-1, Davis Decl. ¶¶ 7-8).)  CliniComp refers to this process as the "'data blob' scheme."  (Id. at 4.)  But even accepting this description of the process utilized by the accused services as correct, CliniComp has failed to demonstrate that this is sufficient to satisfy the Court's construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility." CliniComp has not identified anything within the accused services that satisfies the above five requirements for the claimed "portion[s]."

12

13

14

15

16

17

18

19

20

21

22

23

24

The Court begins its analysis of this issue by noting that CliniComp's briefing is vague and inconsistent as to how precisely the data blob scheme satisfies the Court's claim construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility."[12]  For example, the Court's claim construction requires that the claimed "portion" be "a specific arrangement of data structures of the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility."  (Dkt. No. 91 at 17.)  In its opposition brief, CliniComp never identifies what precisely it considers to be "a specific arrangement of data structures of the database that separates the data."  (See generally Dkt. No. 106 at 11-13.)  CliniComp simply repeats this part of the Court's claim construction without identifying anything from the accused services or providing any analysis.  (See id. at 12.)  As such, CliniComp has entirely failed to explain how this requirement in the Court's claim construction is satisfied by the accused services.[13]

25

26

27

28

---

[12] At the hearing, CliniComp's counsel even described its own briefing as "inarticulate."

[13] The Court notes that in his declaration, CliniComp's expert Mr. Hendryx states:

Further, CliniComp is inconsistent as to what precisely within the data blob scheme it considers to be the claimed "portion[s]."  At times, in its opposition brief, CliniComp appears to contend that the data blobs are the claimed "portion[s]."  For example, under the Court's construction for the claim term, the claimed "portion of the database . . . restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare enterprise facility."  (Dkt. No. 91 at 17-18.)  In an effort to demonstrate that this requirement is met, CliniComp states: "*the data blob* 'restricts access to the data therein' from access 'by any other healthcare facility.'"  (Dkt. No. 106 at 13 (emphasis added); see also id. at 4 ("This *data blob* is an arrangement of data structures of the database . . . ." (emphasis added)), at 13 (""Cerner's use of *data blobs* is not merely 'indexing by an identifier.'" (emphasis added)); Dkt. No. 108 at 8 ("extract data into structured *portions* of the database, referred to as *data blobs*" (emphasis added)), at 11 ("extract data into specific arrangements of data structures, referred to as *data blobs*" (emphasis added)).)  However, despite these numerous statements, in a subsequent filing, CliniComp states that it does not contend that the data blobs are the claimed "portion[s]." (Dkt. No. 112 at 2 ("Cerner's reply brief, by contrast, wrongly asserts that CliniComp identified data blobs as the claimed 'portions.'"), at 1 ("Cerner's Reply falsely asserts CliniComp has identified the data blobs created by the accused Cerner systems as the claimed 'portions.'").)  Indeed, at the hearing on Cerner's motion, CliniComp conceded

---

"The data blob partitions described by Mr. Davis are each a separate arrangement of data structures of the database as required by the Court's claim construction."  Dkt. No. 106-20, Hendryx Decl. ¶ 12; see also id. ¶¶ 10-11 ("These database query restrictions create logical database partitions to separate data[.] . . . These data blobs are the logical partitions discussed above.").  But in its opposition, CliniComp does not identify or rely on this statement.  Indeed, CliniComp never even cites to paragraph 12 of Mr. Hendryx's declaration in its opposition.  (See generally Dkt. No. 106 at 11-13.)  Further, at the hearing, CliniComp conceded that the data blobs do not satisfy the Court's claim construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility."

that the data blobs do not satisfy the Court's claim construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility."[14]

---

[14]   Cerner correctly argues that the identified "data blobs" cannot satisfy the Court's claim construction because a data blob is created after the healthcare data has already been stored in the database, not before.  (Dkt. No. 109 at 5-6.)  Under the Court's claim construction, the claimed "portion of the database is created before the claimed 'storing' of 'data' occurs."  (Dkt. No. 91 at 17.)  This part of the Court's construction was based on CliniComp's repeated clear and unmistakable disclaimers to the PTAB that the claimed "portion" is created in the database before the "storing" of the relevant "data" in the database occurs.  (See id. at 15-16; see, e.g., Dkt. No. 70-2 at E-11-12 ("JUDGE GROSSMAN: . . . And you're saying that in Claim 1, you put the information from the different sources in separate compartments, and you search only each – you have to search each compartment individually.  [CliniComp's Counsel]: I'm saying one step further.  You have to create that compartment for a particular service provider before you can put the data in, before you can do that search."), at E-7, E-10, E-11.)

Under CliniComp's own explanation of how the accused services work, the data blobs are created after the relevant data has already been stored in the database.  (See Dkt. No. 106 at 13 ("The data blob is created by executing a query or running a view *against the database storage*" and "impos[ing] the proper database query restrictions to only *extract data* for the intended client." (emphasis added)), at 12 ("*The retrieved data is collected* as a structured data object, or data blob." (emphasis added)).  In these passages, CliniComp explains that a data blob is created by performing a query on data that is already stored in database storage and then extracting/retrieving that data from database storage into a data blob.  Thus, a data blob is created after the relevant data has already been stored in the database, and, therefore, it cannot satisfy the Court's claim construction.

Cerner also correctly argues that the data blobs cannot constitute the claimed "portion[s]" because CliniComp's theory of infringement would then be invalid when the "portion of the database" limitation is considered in light of the entirely separate "query" limitation.  (Dkt. No. 109 at 6.)  Independent claim 1 recites a method including a "storing" step and a "generating a query" step.  See '647 Patent col. 14 ll. 25-30, col. 14 ll. 36-41.  During the IPR proceedings, in an effort to distinguish the Johnson reference from claim 1 of the '647 Patent, CliniComp clearly and unmistakably stated that the "storing" step is separate from and occurs prior to the "query" step "[b]ecause when you get to the querying process, you have to query that portion of the database."  (Dkt. No. 71-2 at E22; see also id. at E-6–E-7, E-12.)  See Aylus, 856 F.3d at 1361; MBO, 474 F.3d at 1330.  In light of this disclaimer by CliniComp, the data blobs cannot constitute the claimed "portions."

At other times in its opposition, CliniComp appears to contend that the code for imposing the proper database query restrictions is the claimed "portion."  For example, under the Court's claim construction, the claimed "portion of the database is created before the claimed 'storing' of 'data' occurs."  (Dkt. No. 91 at 17.)  In an effort to demonstrate that this requirement is met, CliniComp states: "Cerner's portions are created before the claimed 'storing' occurs because all of the structures used to create data blobs are built into Cerner's system architecture."  (Dkt. No. 106 at 13.)  CliniComp explains that the creation of the data blobs "requires developing the code for generating the query, or creating the views and associated reports to ensure that they impose the proper database query restrictions to only extract data for the intended client."  (Id.)

The problem with this contention is that if the code for imposing the proper database query restrictions constitutes the claimed "portion," then the accused services do not infringe the "storing . . ." limitation.  The method recited in claim 1 of the '647 Patent requires that the processed healthcare data is stored in the first/second portion of the database.  See '647 Patent col. 14 ll. 25-26 ("storing the processed first healthcare data in a first portion of the database").  CliniComp has not identified any evidence in the record showing that the code for the database query restrictions stores any processed healthcare data.  In its opposition brief, CliniComp only identifies the database storage and the data blobs as storing processed healthcare data.  (See generally Dkt. No. 106 at 3-4, 11-13.)  Indeed, at the hearing, CliniComp presented the Court with a demonstrative (Slide 13) showing that the "client data" (i.e., the processed healthcare data) is stored in "persistent database storage" and not in the software containing the programmed database query

---

Under CliniComp's own explanation, the data blobs are created by generating and executing a query against the database storage.  (Dkt. No. 106 at 13; see Dkt. No. 108-16, Davis Decl. ¶ 8.)  This means that if the data blobs are the claimed "portion," then the "generating a query" step cannot be satisfied because the data blobs are created subsequent to the generation and execution of query, not before the query is generated.

restrictions.  As such, identification of the code for imposing the database query restrictions as the claimed "portion" is insufficient to raise a genuine dispute of fact as to the "storing" limitation. See Anderson, 477 U.S. at 256 (explaining that in order to raise a genuine dispute of fact the party must "present affirmative evidence"); see also Icon Health & Fitness, Inc. v. Strava, Inc., 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence.").

In addition, the identified code is also insufficient to raise a genuine dispute of fact as to the "storing . . ." limitation, because CliniComp does not identify any evidence in the record demonstrating the code at issue constitutes a specific arrangement of data structures of the database.  The Court's claim construction requires that the claimed "portion" be "a specific arrangement of data structures of the database." (Dkt. No. 91 at 17.)  The only evidence regarding this part of the Court's claim construction is a statement from CliniComp's technical expert, Mr. Hendryx, stating: "Mr. Davis describes this process as creating data blobs . . . .  These data blobs are the logical partitions . . . .  The data blob partitions . . . are each a separate arrangement of data structures of the database." (Dkt. No. 106-20, Hendryx Decl. ¶¶ 11-12.)  Mr. Hendryx says nothing about the code for imposing the proper database query restrictions being an arrangement of data structures of the database in his expert declaration.  (See generally id.)  As such, CliniComp has no evidence showing that the code at issue satisfies that part of the Court's claim construction. See Anderson, 477 U.S. at 256; Icon Health & Fitness, 849 F.3d at 1043.

Moreover, regardless of whether the data blobs or the code for database query restrictions are the claimed "portion[s]," the data blob scheme identified by CliniComp does not satisfy the Court's construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility" because under the process described by CliniComp, the relevant healthcare data for a particular enterprise is separated from data associated with other enterprises merely through indexing by an identifier.  The Court's claim construction requires that "the claimed [first/second] 'portion' is not created by merely identifying data or associating subsets of data with

common values (*i.e.*, indexing by an identifier)." (Dkt. No. 91 at 17.)  This portion of the Court's claim construction was based on CliniComp's concession in its claim construction briefing that it disclaimed during the IPR proceedings that "indexing alone is insufficient to create the claimed database portions." (Dkt. No. 72 at 2; <u>see</u> Dkt. No. 91 at 14-15; Dkt. No. 63-1 at A2; <u>see also</u> Dkt. No. 71-2 at E-8–E-12; Dkt. No. 71-2, Ex. D at D-85–D-86.)

CliniComp explains that, under the data blob scheme, when a user requests information from the database, programming in the database compiles the request as a query and this query contains "database query restrictions," meaning that the query is modified to include the Logical Domain ID of the relevant healthcare enterprise.  (<u>Id.</u> at 4, 12; <u>see</u> Dkt. No. 108 at 8, 11.)  This insertion of the "the [relevant] Client ID, *i.e.*, a logical domain ID" into the query ensures "that only data for the requesting client is retrieved." (Dkt. No. 106 at 12; <u>see also id.</u> at 13; Dkt. No. 106-20, Hendryx Decl. ¶ 10.)  CliniComp explains that the query is then executed against the database storage and the relevant data is extracted into data blobs, and the data blob is then passed back through the system to the user.  (Dkt. No. 106 at 4, 13.)  CliniComp's expert Mr. Davis provides additional details as to this process, explaining:

> f. Crmrtl.dll communicates the request to the Millennium platform.  **Before** the request is transmitted crmrtl.dll obtains the user[']s Logical Domain and includes that value as metadata within the request sent to Millennium.
>
> g. The millennium platform receives the request to execute program 250072.  It loads that program and sends it through ccllib, which complies the program into a SQL query.  At this point the library uses the user's logical domain value which was included by crmrtl.dll as additional selection criteria are added wherever a table needs to be filtered by Logical Domain.
>
> h. The compiled CCL query is sent to the database driver, in this example ccloracle, which will execute the query, read the results into memory as a structured object, and then returns that object.  This object will include details about the fields returned as well as the data itself.
>
> i. The Millennium platform returns the above structured data blob to the original customer.

(Dkt. No. 108-16, Davis Decl. ¶ 8 (emphasis in original).)

This process is precisely what CliniComp described to the PTAB as constituting indexing under a given unique provider ID and as being insufficient to satisfy the "storing" limitation in claim 1. CliniComp describes a logical domain ID as a client identifier ("client ID") for a particular healthcare enterprise. (See Dkt. No. 106 at 1, 4, 12.) Thus, it is a unique provider ID. Further, during the IPR proceedings, CliniComp used the following analogy to describe indexing:

> The best analogy I can give you is, I had my Outlook calendar and Outlook contacts. I've got hundreds of contacts.
>
> If I want to do a search and find my colleagues or friends at Kirkland & Ellis, because I happen to need them, I can type that in, and all of a sudden, that whole database from Outlook is queried, and low and behold, my four or five contacts from Kirkland show up.
>
> That is what is being disclosed here. That's what indexing does. You still search the full database.

(Dkt. No. 71-2, Ex. E at E-11; see also id. at E22 ("All they've shown you is the ability to identify that service provider data using an indexing technology. It's the same as saying I can go to Outlook, I can find my Kirkland friends, I have that subset of database.").) CliniComp's description of the accused services' use of logical domain IDs to create data blobs aligns with this analogy. Just as in CliniComp's example Outlook utilizes an identifier for the law firm Kirkland & Ellis as a selection criteria when searching the database in order to return only a subset of data associated with that particular law firm, the accused services utilize the logical domain ID as a selection criteria when querying the database storage in order to return only a subset of data associated with that particular client (healthcare enterprise). (See Dkt. No. 108-16, Davis Decl. ¶ 8 (describing the user's logical domain value "as additional selection criteria" used to "filter[] by Logical Domain").) As such, CliniComp's identification of the data blob scheme utilized by the accused services does not satisfy the Court's claim construction for this additional reason.

In addition, Cerner argues that CliniComp's reliance on the data blob scheme cannot raise a genuine dispute of fact as to the "storing . . ." limitation because it contradicts representations CliniComp made to the PTAB during the IPR proceedings regarding what

CliniComp described as "replication." (Dkt. No. 109 at 6-7.) The Court agrees with Cerner. During the IPR proceedings, in an effort to distinguish claim 1 of the '647 patent from the prior art reference Johnson, CliniComp argued that Johnson merely disclosed "replication," which is insufficient to satisfy the "storing" limitation in claim 1. (Dkt. No. 71-2 at E-13E-15, E-23.) CliniComp explained:

> Just from common sense logic, you take this big database, you take a small copy of it, and you make a copy and put it somewhere else, you haven't changed the database.

> The claim limitation says, "Storing the limitation in a first portion." When you take a subcomponent of it and copy it elsewhere, you haven't changed the database at all, and that cannot possibly be a basis for meeting this claim limitation.

(Id. at E-23.) See Aylus, 856 F.3d at 1361; MBO, 474 F.3d at 1330. CliniComp describes the data blob scheme utilized by the accused services as executing a query with database query restrictions against database storage to extract a subcomponent of data into a structured data object, a data blob, (i.e., taking a "small copy of" the data) and then storing the data blob in memory as it is passed back to the requesting user device (i.e., and "put[ting] it somewhere else"). (See Dkt. No. 106 at 12-13.) CliniComp stated during the IPR proceedings that this "cannot possibly be a basis for meeting" the "storing" limitation in claim 1 because "you haven't changed the database at all." (Dkt. No. 71-2, Ex. E at E-23.) The Court is entitled to take CliniComp "at its word" with respect to these statements regarding the proper scope of the "storing" limitation. Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("We take the patentee at its word and will not construe the scope of the [patent-in-suit]'s claims more broadly than the patentee itself clearly envisioned."); see also Aylus, 856 F.3d at 1360 ("[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'").

Finally, CliniComp notes that in certain materials, Cerner has stated that the accused services utilize "logical entity partitions." (Dkt. No. 106 at 10-11 (citing Dkt. No. 108-7, Ex. H at 6, 9; Dkt. No. 108-8, Ex. I at 6).) But this evidence is insufficient to create a

genuine dispute of fact as to the "storing . . ." limitation.  An infringement analysis requires that the factfinder compare the accused services to the properly construed claims.  See Niazi, 30 F.4th at 1350; JVW, 424 F.3d at 1329.  The Court's construction of the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility" does not reference "logical entity partitions."  (See Dkt. No. 91 at 17-18.)  As such, utilization of logical entity partitions, by itself, is insufficient to demonstrate that the accused services satisfy the Court's claim construction for this limitation.[15]

In sum, CliniComp has failed to present evidence demonstrating a genuine dispute of fact as to whether the accused services satisfy the "storing . . ." limitation.  Even viewing the evidence in the light most favorable to CliniComp and even accepting CliniComp's explanation in its opposition of how the accused services work, no reasonable juror could conclude from CliniComp's evidence that the accused services satisfy the Court's construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility."  As such, Cerner is entitled to summary judgment of non-infringement as to independent claim 1 of the '647 Patent on this additional basis.  See Advanced Steel Recovery, 808 F.3d at 1317 (explaining "[s]ummary judgment of noninfringement is proper when no reasonable jury could find that every

_____

[15]     The Court notes that during the IPR proceedings, CliniComp argued that what Cerner referred to as "logical partitions" in the Johnson reference (indexing associated with a unique provider ID) was not "partitioning" and was insufficient to satisfy the "storing" limitation in claim 1.  (See Dkt. No. 71-2, Ex. E at E-8–E-12.)  In addition, during those proceedings, CliniComp's expert Dr. Bergeron explained in a declaration that "partitioning is when a database is 'split into disjoint parts and stored [separately].'"  (Dkt. No. 71-2, Ex. D at D-85.)  In its written decision, the PTAB agreed with CliniComp's argument and cited favorably to Dr. Bergeron's explanation of partitioning.  (See Dkt. No. 71-2, Ex. D at D-85–D-86.)  Further, that winning argument before the PTAB formed the basis for the Court's inclusion of the requirement that "the claimed [first/second] 'portion' is not created by merely identifying data or associating subsets of data with common values (i.e., indexing by an identifier)" in its claim construction for this claim term.  (See Dkt. No. 91 at 14-15.)

limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents.").

### C.   CliniComp's Motion for Leave to File a Sur-Reply

CliniComp moves for leave to file a sur-reply brief.  (Dkt. No. 112.)  In its motion for leave, CliniComp contends that it needs to file a sur-reply to "correct Cerner's assertion that CliniComp is contending that data blobs themselves are the claimed 'portions/partitions'" and to respond to certain arguments made by Cerner based on that purportedly incorrect assertion.  (Dkt. No. 112 at 2-3.)  In response, Cerner argues that CliniComp's motion for leave should be denied because its reply brief properly responded to the data blob arguments that CliniComp explicitly raised for the first time in its opposition brief and expert declaration.  (Dkt. No. 116 at 1, 3-4.)

"Courts generally view motions for leave to file a sur-reply with disfavor." Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc., No. 317CV01118BENBLM, 2018 WL 3198800, at *1 (S.D. Cal. June 26, 2018); accord Nat'l Cas. Co. v. Nat'l Strength & Conditioning Ass'n, No. 18-CV-1292 JLS (KSC), 2020 WL 2991508, at *1 (S.D. Cal. June 4, 2020).  "Neither the federal rules nor the local rules permit a sur-reply as a matter of course."  Whitewater W. Indus., 2018 WL 3198800, at *1.  Nevertheless, "'permitting the filing of a sur-reply is within the discretion of the district court,' but 'only where a valid reason for such additional briefing exists.'"  Nat'l Cas., 2020 WL 2991508, at *1 (quoting Whitewater W. Indus., 2018 WL 3198800, at *1).

Here, CliniComp contends that it needs to file a sur-reply to clarify that it is not asserting that the data blobs are the claimed "portion[s]."  (Dkt. No. 112 at 2.)  But to the extent CliniComp contends this clarification is needed, CliniComp makes that clarification itself in its motion for leave.  (See id. at 1-2.)  CliniComp also provided that clarification at the hearing on Cerner's motion.  And the Court has acknowledged that clarification and included it in its analysis of the "storing . . ." limitation above.  See supra Section III.B.  As such, no further clarification via a separate sur-reply brief is needed.

Further, the Court rejects CliniComp's contention that Cerner's reply brief

improperly contains new arguments.  (See Dkt No. 112 at 2-3.)  Cerner's motion for summary judgment was based in part on its contention that the accused services do not satisfy the "storing . . ." limitation in independent claim 1 of the '647 Patent.  (See Dkt. No. 99-1 at 2, 16-20.)  In response to that contention, CliniComp identified the accused services' use of the data blob scheme and argued that the process used by Cerner satisfied the Court's claim construction for the relevant claim term.  (See Dkt. No. 106 at 4, 11-13.)  Cerner's reply simply responded to CliniComp's arguments regarding the data blob scheme, and it did not contain any inappropriate new non-infringement arguments.  (See Dkt. No. 109 at 5-7.)   See also Viasat, Inc. v. Acacia Commc'ns, Inc., No. 316CV00463BENJMA, 2018 WL 3198798, at *1 (S.D. Cal. June 26, 2018) (denying motion for leave to file a sur-reply and explaining "[i]n the Court's view, Acacia's reply simply responds to the arguments ViaSat raises in its opposition, which is in keeping with the nature and purpose of a reply").

Finally, and importantly, the proposed sur-reply is improper and must be rejected because it contains a brand new never-before-disclosed theory of infringement.  A sur-reply may not be used to introduce new legal arguments for the first time.  See Tounget v. Valley-Wide Recreation & Park Dist., No. EDCV 16-88 JGB (KKX), 2020 WL 8410456, at *3 (C.D. Cal. Feb. 20, 2020) ("[D]efendant's attempt to introduce [in a sur-reply] new legal arguments and the declaration of an undisclosed expert is clearly improper."); Chris-Leef Gen. Agency, Inc. v. Rising Star Ins. Inc., No. 11-CV-2409-JAR, 2011 WL 5039141, at *1 (D. Kan. Oct. 24, 2011) ("defendants cannot use a surreply to add additional arguments to supplement the incomplete research of their response"); see also Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc., 602 F. Supp. 2d 829, 872 n.24 (W.D. Mich. 2008) ("Ordinarily, this court will not consider arguments raised for the first time in a reply or surreply brief.").

In the proposed sur-reply, CliniComp argues that "the database schema and the programmed database query restrictions" within the accused services satisfy the Court's construction for the claim term "[first/second] portion of the database associated with the

[first/second] healthcare enterprise facility."[16]  (See Dkt. No. 112 at 2.)  This is a brand-new theory of infringement.  CliniComp has never previously identified the "database schema" as satisfying the Court's construction for the claim term "[first/second] portion of the database associated with the [first/second] healthcare enterprise facility."  Indeed, CliniComp's opposition brief never references the "database schema" anywhere, and its opposition brief does not even contain the word "schema."[17]  (See generally Dkt. No. 106.)  Further, "database schema" is never mentioned in CliniComp's August 29, 2022 amended infringement contentions in regards to the "storing . . ." limitation.[18]  (See generally Dkt. No. 103, Ex. 2 at 10-12, 21-23, 31.)  As such, CliniComp's proposed sur-reply is improper because it attempts to assert a last-minute brand-new theory of infringement.  See Tounget, 2020 WL 8410456, at *3; Chris-Leef Gen. Agency, 2011 WL 5039141, at *1; see also Wi-LAN, 2019 WL 5790999, at *2 ("'In a lawsuit for patent infringement in the Southern District of California, a patentee is limited to the infringement theories it sets forth in its infringement contentions.'").  Accordingly, the Court denies CliniComp's motion for leave to file a sur-reply brief, and the Court strikes the CliniComp's proposed sur-reply and Cerner's proposed response to the sur-reply.

---

[16]     CliniComp's expert, Mr. Hendryx, explains that "the *database schema*" is the "organization plan" of the database.  (Dkt. No. 106-20, Hendryx Decl. ¶ 9 (emphasis in original).)  In its opposition, Cerner describes the database schema as "the columns in the table."  (Dkt. No. 116 at 5.)

[17]     In addition, CliniComp's Statement of Disputed Material Facts and the declaration from CliniComp's expert Mr. Davis also do not contain the word "schema."  (See generally Dkt. Nos. 108, 108-16.)  The Court acknowledges that in paragraphs 9 and 13 of his declaration, CliniComp's expert Mr. Hendryx refers to "database schema."  (Dkt. No. 106-20, Hendryx Decl. ¶¶ 9, 13.)  But CliniComp never cites to or otherwise relies on paragraph 9 or 13 of Mr. Hendryx's declaration anywhere in its opposition brief.  (See generally Dkt. No. 106.)

[18]     The Court notes that CliniComp's August 29, 2022 amended infringement contentions also never reference "data blobs."  (See generally Dkt. No. 103, Ex. 2 at 10-12, 21-23, 31.)

Further, at the hearing on Cerner's motion, CliniComp attempted to introduce a third new theory infringement as to the "storing . . ." limitation based on the database schema, the programmed database query restrictions, and a "Logical_Domain table." This was entirely improper.   Similar to "database schema," the term "Logical_Domain table" is never referenced in CliniComp's opposition brief, its Statement of Disputed Material Facts, or even its motion for leave to file a sur-reply.   (See generally Dkt. Nos. 106, 108, 112.) Therefore, it was improper for CliniComp to attempt to introduce this new previously undisclosed theory of infringement at the hearing, and this new theory of infringement is untimely and waived.[19]   See, e.g., ABS Glob., Inc. v. Cytonome/ST, LLC, 984 F.3d 1017,

---

[19]    The Court notes that even if it allowed CliniComp to raise this new theory of infringement (the Court does not), summary judgment of non-infringement based on the "storing . . ." limitation would still be appropriate.   The method recited in claim 1 of the '647 Patent requires that the processed healthcare data is stored in the claimed "portion[s]" of the database.   See '647 Patent col. 14 ll. 25-26 ("storing the processed first healthcare data in a first portion of the database").   CliniComp has not identified any evidence in the record showing that "the database schema," "the programmed database query restrictions," or the "Logical_Domain table" store any processed healthcare data.   See Anderson, 477 U.S. at 256 (explaining that in order to raise a genuine dispute of fact the party must "present affirmative evidence"); see also Icon Health & Fitness, 849 F.3d at 1043 ("Attorney argument is not evidence.").   Indeed, at the hearing, CliniComp conceded that the database schema does not store any healthcare data.   Further, at the hearing, CliniComp presented the Court with a demonstrative (Slide 13), showing that the "client data" (i.e., the processed healthcare data) is stored in "persistent database storage," and not in any of the items identified by CliniComp.

Further, CliniComp has not identified any evidence in the record demonstrating that the identified items constitute "a specific arrangement of data structures of the database" as required by the Court's claim construction.   (Dkt. No. 91 at 17; see generally ECF No. 106-20, Hendryx Decl.; ECF No. 108-16, Davis Decl.)   Finally, the process identified by CliniComp is still insufficient as a matter of law to satisfy the "storing . . ." limitation because the process merely segregates healthcare data between clients via indexing by an identifier and what CliniComp described as "replication" to the PTAB.   See supra Section III.B.   As such, the new theory of infringement is still insufficient to raise a genuine dispute of fact as the "storing . . ." claim limitation.

1027 (Fed. Cir. 2021) (finding argument waived because it was "raised for the first time during oral argument"); In re LexinFintech Holdings Ltd. Sec. Litig., No. 3:20-CV-1562-SI, 2021 WL 5530949, at *15 (D. Or. Nov. 24, 2021) ("Plaintiffs raised these arguments for the first time at oral argument, and thus they are untimely and waived."); see also Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal, and we do so here."); Wi-LAN, 2019 WL 5790999, at *2 ("'In a lawsuit for patent infringement in the Southern District of California, a patentee is limited to the infringement theories it sets forth in its infringement contentions.'").

D.     The "Configuring the Database . . ." Claim Limitation

Cerner also argues that it is entitled to summary judgment of non-infringement because the accused services do not satisfy the "configuring the database to accept legacy information derived from a legacy application" limitation in independent claim 1 of the '647 Patent.  (Dkt. No. 99-1 at 20-24; Dkt. No. 109 at 7-10.)  Because the Court has already concluded that Cerner has established that the accused services do not infringe claim 1 of the '647 Patent as a matter of law based on the absence of two other claim limitations, the Court declines to address this additional basis for summary judgment of non-infringement.

E.     Dependent Claims 2, 5, 10-13, 15-18, and 20-23

Independent claim 1 of the '647 Patent is the only independent claim asserted in this action.  (See Dkt. No. 103, Ex. 2 at 2 (listing as the asserted claims as claims 1, 2, 5, 10-13, 15-18, and 20-23 of the '647 Patent).)  All the other asserted claims depend from asserted claim 1.  See '647 Patent col. 14 ll. 46 to col. 15 ll. 39.

"One who does not infringe an independent claim cannot infringe a claim dependent (and thus containing all the limitations of) that claim."  Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989).  Accordingly, because the accused services do not infringe independent claim 1 as a matter of law, the accused services also do not infringe asserted dependent claims 2, 5, 10-13, 15-18, and 20-23 of the '647 Patent as a

matter of law.  See, e.g., Ferring B.V. v. Watson Lab'ys, Inc.-Fla., 764 F.3d 1401, 1411 (Fed. Cir. 2014) ("Because we hold that the asserted independent claims of Ferring's patents are not infringed, the asserted dependent claims are likewise not infringed.").

## III.   CONCLUSION

In sum, Defendant Cerner has demonstrated that the accused services do not infringe the asserted claims of the '647 Patent as a matter of law.  As such, the Court grants Cerner's motion for summary judgment of non-infringement.   In addition, the Court denies CliniComp's motion for leave to file a sur-reply, and the Court strikes CliniComp's proposed sur-reply and Cerner's proposed response to the sur-reply.  The Clerk of Court is directed to strike the sur-reply (Dkt. No. 112-1) and the response to the sur-reply (Dkt. No. 116-1) from the docket and to enter judgment in favor of Defendant Cerner and against Plaintiff CliniComp and close the case.

IT IS SO ORDERED.

Dated:  November 15, 2022

Hon. Gonzalo P. Curiel
United States District Judge

17-cv-02479-GPC (DEB)