# Exhibit 3



September 28, 2022

**Via E-Mail**

Bruce Zisser
Manatt, Phelps & Phillips, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
bzisser@manatt.com

Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400
orrick.com

**Jared Bobrow**

E jbobrow@orrick.com
D +1 650 614 7405
F +1 650 614 7401

Re:  *CliniComp Int'l, Inc. v. Cerner Corp.*, Case No.: 17-cv-2479-GPC (S.D. Cal.)

Dear Bruce:

I write to request that CliniComp dismiss its claims for infringement of U.S. Patent 6,665,647 (the "'647 Patent") with prejudice. Those claims, as spelled out in CliniComp's Final Infringement Contentions, are objectively meritless and inconsistent with the Court's claim construction rulings. If CliniComp does not immediately dismiss this action, Cerner will seek to recover the fees it has incurred and will incur in defending this baseless lawsuit. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); 35 U.S.C. § 285.

As explained in more detail herein, and for the reasons articulated in Cerner's September 19, 2022 Motion for Summary Judgment (Dkt. 99-1) (the "Cerner MSJ"), CliniComp's claims are based on multiple unreasonable and unsupportable claim constructions. The Court rejected those constructions in its July 28, 2022 Claim Construction Order. Dkt. No. 91. In doing so, the Court issued several rulings that were objectively dispositive of CliniComp's claims for infringement as articulated in CliniComp's February 14, 2022 Amended Infringement Contentions ("Amended IC's").

CliniComp's recent August 29, 2022 Final Infringement Contentions (Final IC's) do not (and cannot) repair CliniComp's failed claims. In fact, CliniComp appears to have served those contentions in bad faith because CliniComp completely ignores the substance of the Court's constructions and continues to assert the same theories it asserted before the Court's Order. In other words, CliniComp's claims for infringement continue to rely on constructions that are inconsistent with the Court's Order. CliniComp has not articulated how Cerner could possibly perform Claim 1 given the undisputed functionality of the accused services and systems and the Court's Claim Construction Order. Accordingly, CliniComp should dismiss its claims with prejudice. To the extent CliniComp does dismiss its claims with prejudice by October 7, 2022, Cerner is prepared to waive its claim for attorneys' fees incurred to date.



Bruce Zisser
September 28, 2022
Page 2

### A. The Accused Systems

CliniComp accuses Cerner's multi-tenant solutions (Community Works and Power Works) of infringing the '647 Patent because those services use a multi-tenant implementation of Cerner's Millennium database in which multiple clients' data is stored in a single database. Final IC's at 2 and Exhibits A & B (referring to "multi-tenant" environments of Community Work and Power Works where "multiple clients (tenants) stored data on a single database.").

CliniComp's infringement contentions also accuse Cerner of infringing Claim 1 in connection with its Lights On Network ("Lights On" or "LON"). Specifically, CliniComp contends that Cerner collects data from its customers' Millennium databases and stores that data in its Lights On Database at Cerner's data center in Kansas City. Final IC's, Ex. C at 1-2. CliniComp further contends that the Lights On database stored data for multiple clients in the same database. Final IC's, Ex. C at 3.

For the reasons below and in the Cerner MSJ, CliniComp's allegations of infringement are objectively meritless.

### B. The Accused Systems Do Not Limit Access to User Devices "In the [First/Second] Facility."

Claim 1 of the '647 Patent requires that "healthcare data in the first portion of the database is only accessible to the first end user device and healthcare data in the second portion of the database is only accessible to the second end user device." '647 Patent at Claim 1 (emphasis added). The Court construed this limitation to mean:

> wherein the portioning of the database enables restricting access such that healthcare data stored in the first portion of the database cannot be accessed by any device other than the [one or more] first end user device(s) and healthcare data stored in the second portion of the database cannot be accessed by any device other than the [one or more] second end user device(s)."

Dkt. No. 91 at 32. Claim 1 further requires that the end user devices that can access the database must be "in the [first/second] enterprise facility." '647 Patent at Claim 1 (14:14 and 14:17-18). Together, the claim requires that healthcare information associated with the first enterprise facility can



Bruce Zisser
September 28, 2022
Page 3

only be accessed by a first end user device "in the first enterprise facility." *Id.* And it requires that healthcare information associated with the second enterprise facility can only be accessed by a second end user device "in the second enterprise facility." *Id.*

Critically, the Court made clear that this means that the claimed method uses device-based restrictions and not user-based restrictions on access to data. *Id.* at 28 ("[C]laim 1 further states that it is these user devices that have sole access to the respective portions of the database. If the patentee wanted the access to be limited to the healthcare enterprises' users rather than its devices, the patentee could have used express language stating so. The patentee did not.").

1. **Community Works and Power Works Do Not Limit Access to User Devices "In the [First/Second] Facility."**

Community Works and Power Works do not satisfy this limitation because customers who use Community Works and Power Works can access their facility's data remotely from *any* device with an Internet connection, including outside of their facility. Cerner MSJ at 12-15. Indeed, as Eric Geis testified during his depositions, such customers can access their data from any Internet-enabled device anywhere. 7/8/2022 E. Geis Dep. Tr. at 119:14-120:17 ("It's all running remotely through Citrix so they can log in from anywhere. I could be at a hospital in Oklahoma, you know, and I would log in the same way as if I was visiting Hawaii. I could walk in that hospital system in Oklahoma. So it's all served – it's all managed at the CernerWorks, you know, data centers here in Kansas City, and then made available you know, through Citrix and the Citrix log in page at the presentation layer."). Moreover, there is no dispute that the data is also accessible to Cerner employees who may need to access or update the data or that those employees can access the information remotely, *i.e.*, from their home computer or any other device with an internet connection.

CliniComp's Final Infringement Contentions do not cite any contrary evidence or even contend otherwise. To the contrary, CliniComp acknowledges that the accused systems limit access based on the *user* who is attempting to access the system and not on the device they are using or the location of that device. Final IC's, Ex. A at 8 ("The database query restrictions used to create each database portion restrict access to that database portion such that it cannot be accessed by any device other than *those devices associated, through their users, with the logical domain ID of the healthcare enterprise facility to which the database portion belongs*.") (emphasis added) and Ex. B at 6-7. This is completely inconsistent with the Court's claim construction order, which rejected that very argument. Dkt. 91 at 27-28 ("Here, the parties dispute whether this claim term requires that the





Bruce Zisser
September 28, 2022
Page 4

first portion of the database be accessible to only the first end user device, as Cerner contends, or whether the claim term requires that the first portion of the database be accessible to only the first end user and their devices, as CliniComp contends . . . . If the patentee wanted the access to be limited to the healthcare enterprises' users rather than its devices, the patentee could have used express language stating so. The patentee did not.").

Accordingly, CliniComp indisputably has no reasonable basis to continue alleging that Cerner has satisfied this limitation with any implementation.

### 2. The Lights On System Does Not Limit Access to the First/Second End User Device(s).

The Lights On system also does not satisfy this limitation because Cerner clients can access their data from any device with an Internet connection at locations outside their facility, not only from the first/second end user device(s) in the first/second facility. Cerner MSJ at 15-16. As the undisputed evidence has shown, the Lights On system (1) restricts access to certain users (not devices) and (2) allows those users to access the data from devices with an Internet connection at any location through the Lights On web site (access is not limited to the first/second end user devices).



CERN-00118162 (Lights On Network Reference Pages) at 118486.





Bruce Zisser
September 28, 2022
Page 5

CERN-00118162 (Lights On Network Reference Pages) at 118487. The documents further show that Cerner staff may access the data from anywhere through the Lights On website:



CERN-00118162 (Lights On Network Reference Pages) at 118486. That such information is remotely accessible by client users and Cerner users was further confirmed by the developer of the Lights On Network, Murtaza Gadit. 6/29/2022 M. Gadit Dep. at 62:6-9, 134:16-17, 166:3-4, 189:10-15, and 193:3-11.

CliniComp's Final Infringement Contentions do not cite any contrary evidence or argue otherwise. Instead, CliniComp again only contends that access is restricted to devices based on the ***device's user***. Final IC's, Ex. C at 5 ("The database query restrictions used to create each database portion restrict access to that database portion such that it cannot be accessed by any device other than those devices associated, ***through their users***, with the client associated with the LON database partition."). Indeed, CliniComp admits that such users can access their data through a cloud-based service over the Internet (i.e., access is not limited to specific devices) (emphasis added). Final IC's, Ex. C at 1 ("The LON was a cloud-based service accessed over the Internet using user devices.").

Accordingly, CliniComp has already admitted that the Lights On Network does not satisfy this limitation under the Court's construction. It cannot reasonably continue to assert infringement.

### C. The Accused Systems Do Not Store Client Data for Different Clients in Separate "Portions" of a Database.

Claim 1 requires the step of "storing the processed first healthcare data in a first portion of the database associated with the first healthcare enterprise facility and storing the processed second



Bruce Zisser
September 28, 2022
Page 6

healthcare data in a second portion of the database associated with the second healthcare enterprise facility." '647 Patent, Claim 1. The Court construed this to require that the claimed "portions" of the database meet specific requirements. Specifically, the Court held that a first/second portion of the database associated with the first/second healthcare enterprise facilities must be:

> A specific arrangement of data structures of the database that separates the data associated with the [first/second] healthcare enterprise facility from data associated with any other healthcare enterprise facility,
>
> wherein the claimed [first/second] "portion" is not created by merely identifying data or associating subsets of data with common values (i.e., by indexing by an identifier),
>
> and the [first/second] portion of the database is created before the claimed "storing" of "data" occurs,
>
> and restricts access to data therein to protect data associated with the [first/second] healthcare enterprise facility from access by any other healthcare enterprise facility."

7/28/2022 Claim Construction Order at 10-18.

### 1. Community Works and Power Works Do Not Store Client Data for Different Clients in Separate "Portions" of a Database.

CliniComp has not cited—and it cannot cite—any evidence that the accused Community Works or Power Works systems ever stored data in the requisite "portions" of a database. Indeed, as explained in the Cerner MSJ, the accused multi-tenant functionality of these services operates in direct contrast to the Court's construction because the accused systems (1) do not separate client data into specific memory blocks or other "specific arrangement[s] of data structures" and instead (2) restrict such clients/tenants from accessing each other's data by associating each client's data with a unique client identifier that can be used to index the data in response to specific queries. Cerner MSJ at 16-19. The evidence is clear on this fact and, critically, CliniComp does not appear to dispute that Community Works and Power Works function this way.

For example, Cerner's Lead Technology Architect (Dan Murphy, Ph.D.) testified that a single instance or "Domain" of the Millennium database in Community Works or Power Works can comprise multiple "logical" domains, i.e., one for each client. Dr. Murphy also testified, however, that each



Bruce Zisser
September 28, 2022
Page 7

"logical domain" involves nothing more than stamping each client's data with a unique identifier (a "Logical Domain ID") so that it can be indexed and selectively searched.

> Q. Does that mean it has to be flexible enough to accommodate the different circumstances?
>
> A. What it means [is] we have to stamp on many tables, certainly not all of our tables, **an I.D., indicating whether or not it's from Client A or Client B or Client C, <u>and it's all stored in the same tables</u>** . . . .

3/17/2022 D. Murphy Dep. at 76:20-77:9 (emphasis added); *see also id.* at 89:4-12 ("there is a logical domain ID stamped on many, certainly not all tables that will indicate, you know, it will be a number like 01234, indicating which of the tenants that the data is associated with."); *id.* at 91:10-13 ("[T]here's a logical domain added to a number of the tables and each tenant has its own ID."); *id.* at 91:16-22 ("The data in the table is just a table, and the software is responsible for making sure you only get the data for the correct logical domain.").

Dr. Murphy also made clear that, the "logical domains" do not separate client data into assigned memory blocks or other specific arrangements of data structures as required by the Court's construction and, instead, each client's data is comingled in the same memory and tables as the other clients who share the single database:

> Q. . . . . The document seems to be saying that by creating, putting logical domains, you've created a partition, but from what I hear from you, that's not the way you would use the language; is that right?
>
> A. It certainly isn't in any way of a database sense. **<u>The data is all co-located in the same table, and if you would look at it on disk you might have, you know, a block of data, and you could have five different clients' worth of data in that same block, and then, and so on. So the data isn't kept on disks physical separated</u>** . . .

*Id.*, at 91:23-92:12 (emphasis added). In fact, on several occasions, you expressly confirmed with Dr. Murphy in deposition that the accused systems did *not* separate client data in any specific arrangements of data structures and, instead, simply stored the data as it comes in such that the data was comingled/collocated:

Case 3:17-cv-02479-GPC-DEB   Document 124-5   Filed 11/30/22   PageID.3522   Page 9 of 15



Bruce Zisser
September 28, 2022
Page 8

> Q. Okay, and would the different tenants, *is there any specification of where any particular tenant's data gets stored, meaning does it all get stored in the same memory, you know, indistinguishable as far as just data in the memory, or is there some allocation of memory for different tenants.*
>
> A. So, with – for the data stored on the disks for the multiple tenants in a single Oracle domain, there's no separation of where the data would get stored for a particular table that you're talking about. **The data isn't divided**, *kind of like I indicated before, the data comes in more or less, you know, the data comes in in whatever order it comes in, from whatever tenant it comes in, and then they just get written to the next available block, but Oracle doesn't attempt to say this data needs to go into these blocks, because it's from Tenant A, and the data needs to go into that, to this other storage location, because it's Tenant B*, all within a domain versus multiple Tenants. You're showing something that has multiple domains.

3/17/2022 D. Murphy Dep. at 129:25-130:23 (emphasis added); *see also id.* at 94:11-23 ("Q. So data comes in, and a multi-tenanted environment it can come there in from Tenant 1 and the next from Tenant 2, and the next Tenant 3, *and Oracle will just put it in the next available space, regardless of what block it's in, correct?* **A. Yes . . . .**") (emphasis added); *id.* at 143:9-144:13 ("Q . . . . *I mean if you think about it, in the table level, that could be right next to the data from some other tenant.* **A. Yes . . . .**") (emphasis added).

CliniComp's Final Infringement Contentions do not cite any contrary evidence or even contend otherwise. In fact, CliniComp admits that the accused multi-tenant systems separate client data into "Logical Domains." Final IC's, Ex. A at 5 ("several clients use the same domain (Ex: Domain A), but have it partitioned off for each client into what are called Logical Domains.") and Ex. B at 4 (same). And CliniComp acknowledges that the data is only "separate" in the sense that each client's "Logical Domain" is associated with that clients Logical Domain ID such that queries made by that client will only return data associated with that ID. *See, e.g., id.*, Ex. A at 5-6 (█████████████████████████████████████) and noting that the data is kept "separate" by "programming database query restrictions" such that a client's search will only return data for that client."). CliniComp does not cite any evidence that the accused systems separate client data into specific memory blocks or other specific arrangements of data structures. *Id.*



Bruce Zisser
September 28, 2022
Page 9

In other words, at best, CliniComp contends only that the multi-tenant systems restrict one client/tenant from accessing the data of another using logical identifiers and indexing means. But, as the Court has now expressly held, Claim 1 requires far more than that; it requires that data be separated in a very specific way. CliniComp essentially admits that the accused systems do not separate client data in that way and, accordingly, CliniComp's claim is objectively meritless.

### 2. The Lights On System Does Not Store Data for Different Clients in Separate "Portions" of the Lights On Database.

Like the Millennium database used by Community Works and Power Works, the Lights On database does not separate each client's data into different "portions" of the database. Cerner MSJ at 19-20. Instead, it prevents clients from accessing each other's data in a shared "Domain" by indexing each customer's data with a specific identifier (a "client domain relation ID") such that application software can selectively search the database for data associated with a particular customer. Specifically, the developer of the Lights On System, Murtaza Gadit, testified to the following:

> A.   So those metric would be housed in a specific table and *that table would contain all the clients' data <u>marked by that client identifiers</u>*. So in layman's terms, *I would say it's comingled data in the same table, and you would access it via the index and controlled security to that specific client for that data set.* And that was at a very, very high level the general structure of every table at Lights On.
>
> Q.   Okay. So in every table in Lights On, if you had a table that, say had response times for some metric . . . *That table would have all the clients' data in the same table; is that right?*
>
> A.   *That is correct.*
>
> Q.   *And each record in that table would have a --- client identifier?*
>
> A.   *That is correct.*
>
> Q.   And when you – when a client went to access their data and the client wanted to see its dashboard that showed it the data, the query that grabbed that data would – would use the client identifier as part of the query. Is that right?



Bruce Zisser
September 28, 2022
Page 10

> A. *The query would enforce that the client identifier is always present to only bring back that client-specific role, yes*.
>
> Q. Okay. And – and what's the – what's the client identifier? Is it a particular name or field name?
>
> A. *It would be a column on a table. Most often it would be called if you want to – if you have our schema, it would be called client domain relation ID*, but we use shorthand forms across all the tables because, as you can see, it's probably a long name, client domain relation ID, hard to type up every time you had a query.
>
> […]
>
> Q. Okay. *Are there any instances in where one client's data would be stored in a separate table or set of tables from other clients?*
>
> A. *Never . . . . It would never be stored that way*.

6/29/2022 M. Gadit Dep. at 189:23-192:13 (emphasis added).

Again, CliniComp's Final Infringement Contentions do not cite any contrary evidence or argue otherwise. In fact, CliniComp again admits that client data is only "separate" because database queries are programmed such that they will only return data for the identifier associated with the customer who is requesting data. Final IC's at 3 ("Cerner created partitions for each LON client before storing any client data in the LON database by programming database query restrictions to "enforce" the separation of one client's data from other clients' data. These database query restrictions use each client's Client Domain Relation ID to create a specific arrangement of data structures for each client."). But CliniComp does not cite evidence (or even contend) that the Lights On System separated client data into specific memory blocks or any other actual specific arrangement of data structures. Accordingly, CliniComp's claim is objectively meritless.

### D. The Accused Systems Are Not Configured to Accept Both Raw and Processed Legacy Information.

Claim 1 requires the step of "configuring the database to accept legacy information derived from a legacy application operating at each of the first and second healthcare enterprise facilities" '647 Patent,



Bruce Zisser
September 28, 2022
Page 11

Claim 1. The Court construed this term to require "configuring the database to accept both raw and processed legacy information." 7/28/2022 Claim Construction Order at 19-20. In doing so, Court expressly rejected CliniComp's argument that a system can infringe even if it is unable to accept legacy information that has not been converted to match the capabilities of the database. *See id.* at 18 ("Here, the parties dispute whether the Court's construction for this term should require that the database be able to accept legacy information that has not been converted to match the capabilities of the database.") and 20 (the prosecution history "unambiguously states that [the prior art] does not satisfy the 'configuring a database' limitation because the claimed database in [the prior art] only accepts data that has already been converted into the proper format. This is sufficient to constitute a clear and unmistakable disclaimer of any claim interpretation that would permit the 'configuring a database' limitation to be satisfied by a database that is only able to accept data that has already been converted into the proper format.").

1. **The Community Works and Power Works Databases Are Not Configured to Accept Both Raw and Processed Legacy Information.**

Cerner has not performed this step with respect to any Community Works or Power Works implementation. Cerner MSJ at 20-22. Community Works and Power Works both use implementations of Cerner's Millennium database. To the extent any legacy information is uploaded to that database, the information is configured/transformed to adapt to the database format, not the other way around. The database is not changed or configured to accept "raw" data from a legacy application.

The evidence is clear on this point. Dr. Murphy, for example, testified that "historical" data from legacy applications must be translated or mapped before it can be uploaded to the Millennium database. *See, e.g.*, 3/17/2022 D. Murphy Dep. at 139:24-141:3 ("it's basically a transformation process. . . . . There's basically a mapping process going out from the source system into HL7, and then another mapping transformation process going into the target system."). Eric Geis similarly testified that there must be a "Crosswalk" or "Translation" of legacy data before it can be uploaded to the Millennium database and that database is not configured or changed to accept raw data. He further testified that this translation is done in the application layer before the data is uploaded to the database. 7/8/2022 E. Geis Dep. at 181:10-184:3.

CliniComp's Final Infringement Contentions do not cite any contrary evidence or even contend otherwise. In fact, in its Final Infringement Contentions, CliniComp admits that Community Works




Bruce Zisser
September 28, 2022
Page 12

and Power Works process data before it is stored. Final IC's Ex. A at 4 ("Data received by the *CommunityWorks* system was processed before it was stored. This processing included, for example, data translations and/or conversions to make sure the data was in the proper format to be stored in the *CommunityWorks* database.") (italics in original); *id.*, Ex. B at 3 ("Data received by the *PowerWorks* system was processed before it was stored. This processing included, for example, data translations and/or conversions to make sure the data was in the proper format to be stored in the *CommunityWorks* database.") (italics in original).

For Community Works, CliniComp argues that "the *Millennium* database schema was specifically configured to accept data from legacy mediation management systems, such as Pyxis and OmniCell, by adding specific columns to tables within the Millennium database schema." Final IC's, Ex. A at 6. But CliniComp does not dispute that information from Pyxis and OmniCell—like all legacy data— must still be processed through a foreign systems interface ("FSI") before it is accepted into the Millennium database such that it is mapped to other tables and columns in the database.

For Power Works, CliniComp cites a number of alleged legacy applications but admits that data from such legacy applications must pass through an FSI before being accepted into the Millennium database. Final IC's, Ex. B at 5 ("Cerner has configured its *Millennium* database to accept, **and has provided Foreign System Interfaces to enable the receipt of** at least data from PACS used with imaging systems, and other systems used to interface with office-based diagnostic tools, such as ultrasounds, and EKG/ECG machines.") (emphasis added); *see also* Amended IC's, Ex. B at 4 ("For example, the *Cerner Millennium* system implemented as part of *CernerWorks*, used Foreign System Interfaces to upload historical data from a foreign, *i.e.*, legacy system, operating at the Cerner customer's facility into *Cerner Millennium*.").

Simply put, Cerner cannot identify a single set of Community Works or Power Works customers and associated legacy applications for which Cerner has performed the step of "configuring the database to accept both raw and processed legacy information derived from a legacy application in operation at each of the first and second healthcare enterprise facilities." Accordingly, CliniComp cannot reasonably continue to pursue its claims for infringement.



Bruce Zisser
September 28, 2022
Page 13

### 2. The Lights On Database Is Not Configured to Accept Both Raw and Processed Legacy Information.

Cerner also does not perform this step with respect to the Lights On database, because it never configures that database to access raw legacy information. As Mr. Gadit testified, the Lights On database doesn't accept legacy data at all. The information or "insights" contained in the Lights On database are comprised of performance data used to provide performance analytics. 6/29/2022 M. Gadit Dep. at 147:8-11 (noting that Lights On network collects "settings, the system activity, the clinical activity that they produced, and the user interactions produced on that application"). Moreover, as Mr. Gadit and Mr. Griffin both testified, the information is pulled from Cerner's systems (e.g., Millennium) and is processed as part of the collection process. 6/29/2022 M. Gadit Dep. at 61:10-64:24 (". . . . behind the scenes we have multiple databases today that house that data, *in a transformed fashion, what we call macro transformations* that we attempt to do when we bring back data from our client sites . . . . And once those insights are created, those insights are then pushed to a final database which is what I would like to call the Lights On database where all those final insights exist.") (emphasis added); *see also id.* at 149:12-21 and 150:25-151:10; 9/14/2022 B. Griffin Dep. at 139:2-3 ("Q. . . . is it fair to say that any information stored in the Lights On database is processed at least once before being stored in the Lights On database? A. Yes. Q. Are the tables in the Lights On database in the same format as the tables in the Millennium database? A. No. Q. So at a minimum, the data has to be processed to match the format of the tables in the Lights On database; is that fair? . . . A. Yes, at a minimum, yes.").

In other words, to the extent any legacy information actually reaches the Lights On database, it has been processed no less than three times: (1) between the legacy application and the Cerner Client databases (e.g., Millennium), (2) between the Cerner Client database and one or more intermediate databases, and (3) between the intermediary databases and the Lights On database. The Lights On database is never configured to accept "raw" legacy information.

CliniComp's Final Infringement Contentions do not cite any contrary evidence or argue that the Lights On database was configured to accept both raw and processed legacy information. Instead, CliniComp appears to argue that "the LON database was configured to accept both raw and processed legacy information <u>derived from a legacy applications</u>." Final IC's, Ex. C at 4 ("The LON database was configured to accept both raw and processed 'legacy information <u>derived from a legacy application</u>,' at least because the LON database schema was modified to create the space necessary to accommodate the data that supports the Foreign Systems Interface (FSI) dashboard."). But the



Bruce Zisser
September 28, 2022
Page 14

Court's construction requires more than accepting processed and raw legacy information "derived from a legacy application"; it requires accepting the actual "raw legacy information." Dkt. No. 91 at 20. Moreover, CliniComp has not identified or explained (let alone cited any evidence of) the specific legacy information it is referring to or how it contends Cerner modified the Lights On database to accept it. Final IC's, Ex. C at 4. Moreover, as CliniComp admits, the FSI dashboard provided information "about FSI transactions," *e.g.*, the number of transformations that occurred between legacy systems and the Millennium database. This does not constitute legacy data, let alone "raw" legacy data.

Accordingly, CliniComp's claims for infringement are again objectively meritless and must be dismissed.

\*\*\*

For all of these reasons, it is objectively unreasonable for CliniComp to continue its prosecution of its case against Cerner. Cerner is prepared to waive its claim for attorneys' fees incurred to date only if Plaintiff dismisses its lawsuit with prejudice by October 7, 2022.

Very truly yours,

/s/ Jared Bobrow

Jared Bobrow

cc:  Amar L. Thakur (athakur@manatt.com)
     Shawn E. McDonald (SMcDonald@manatt.com)
     CliniCompServiceManatt@Manatt.com